STATE of Wisconsin,
Plaintiff-Respondent-Cross-Appellant,

v.

ABBOTT LABORATORIES, AstraZeneca LP,
AstraZeneca Pharmaceuticals LP, Aventis
Behring, LLC f/k/a ZLB Behring, LLC, Aventis
Pharmaceuticals, Inc., Ben Venue Laboratories,
Inc., Boehringer Ingelheim Pharmaceuticals, Inc.,
Boehringer Ingelheim Roxane, Inc., Bristol-Myers
Squibb Co., Dey, Inc., Ivax Corporation, Ivax
Pharmaceuticals, Inc., Janssen LP f/k/a
Janssen Pharmaceutica Products, LP, Johnson &
Johnson, Inc., McNeil-PPC, Inc., Merck & Co.
f/k/a Schering-Plough Corporation, Merck Sharp
& Dohme Corp. f/k/a Merck & Company, Inc.,
Mylan Pharmaceuticals, Inc., Mylan, Inc. f/k/a
Mylan Laboratories, Inc., Novartis Pharmaceuti-
cals Corp., Ortho Biotech Products, LP, Ortho-
McNeil Pharmaceutical, Inc., Pfizer Inc., Roxane
Laboratories, Inc., Sandoz, Inc. f/k/a Geneva
Pharmaceuticals, Inc., Sicor, Inc. f/k/a Gensia
Sicor Pharmaceuticals, Inc., SmithKline
Beecham Corp. d/b/a GlaxoSmithKline, Inc.,
TAP Pharmaceutical Products, Inc., Teva
Pharmaceuticals USA, Inc., Warrick
Pharmaceuticals Corporation, Watson Pharma,
Inc. f/k/a Schein Pharmaceuticals, Inc. and
Watson Pharmaceuticals, Inc., Defendants,

Pharmacia Corporation,
Defendant-Appellant-Cross-Respondent.

Court of Appeals

*No. 2010AP232–AC. Oral argument December 6, 2011.
—Decided February 6, 2013.*

2013 WI App 31

(Also reported in 829 N.W.2d 753.)

On behalf of the defendant-appellant-cross-respondent, the cause was submitted on the briefs of *O. Thomas Armstrong* and *Beth Kushner* of *von Briesen & Roper S.C.* of Milwaukee; *John C. Dodds, Erica Smith-Klocek, Susannah Henderson,* and *Kathryn E. Potalivo* of *Morgan, Lewis & Bockius LLP* of *Philadelphia, PA;*

and *John Clayton Everett, Jr.* of *Morgan, Lewis & Bockius LLP* of Washington, DC.

On behalf of the plaintiff-respondent-cross-appellant, the cause was submitted on the briefs of *J.B. Van Hollen*, attorney general, and *Frank D. Remington*, assistant attorney general; *George F. Galland, Jr., Charles Barnhill, Jr., Betty Eberle*, and *Barry J. Blonien* of *Miner, Barnhill & Galland P.C.* of Madison; and *P. Jeffrey Archibald* of *Archibald Consumer Law Office* of Madison.

A nonparty brief was filed by *Lester A. Pines* of *Cullen Weston Pines & Bach LLP* of Madison; *Jay P. Lefkowitz, Jennifer G. Levy*, and *John K. Crisham* of *Kirkland & Ellis LLP* of Washington, D.C. on behalf of the defendants.

A nonparty brief was filed by *Donald K. Schott, Freya K. Bowen* and *Matthew J. Splitek* of *Quarles & Brady LLP* of Madison; *Andrew D. Schau* of *Covington & Burling LLP* of New York; and *William F. Cavanaugh, Jr., Peter C. Harvey*, and *Adeel A. Mangi* of *Patterson Belknap Webb & Tyler LLP* of New York.

Before Brown, C.J., Neubauer, P.J., and Reilly, J.

¶ 1. BROWN, C.J. This case has returned to us after certification of three issues to the supreme court. The supreme court answered our questions and re-manded the case for us to decide the rest, cautioning that its opinion was not to be construed as deciding the remaining issues, which are many. We heed that caution but our answer to the remaining issues is nonetheless informed by the supreme court's decision on those that were certified. We address each remaining issue ad seriatim and affirm.

## BACKGROUND

¶ 2.    What follows is a general overview of the case based on the supreme court's summary of the facts. *See State v. Abbott Labs.*, 2012 WI 62, ¶¶ 2–28, 341 Wis. 2d 510, 816 N.W.2d 145. Additional facts will be discussed as necessary to the issues in the discussion section.

¶ 3.    In Wisconsin, Medicaid reimbursement formulas are drawn up by the legislature as part of the biennial budget process and signed into law by the governor. *Id.*, ¶ 5. During that process, the legislature and governor receive input from lobbying interests, Department of Health Services, and other state officials. *Id.* The litigation in this case is principally over one component of Wisconsin's reimbursement formula, known as an "average wholesale price" (AWP). *Id.*

¶ 4.    In 2004, the State filed a civil action against several dozen large pharmaceutical manufacturers, alleging that each reported inflated AWPs, thereby causing Medicaid to overpay for drugs and violating Wis. Stat. §§ 100.18 (2009–10)[1] (the Deceptive Trade Practices Act, or DTPA) and 49.49(4m)(a)2. (the Medicaid fraud statute). *Abbott*, 341 Wis. 2d 510, ¶ 8 & nn.6–7. After extensive discovery, Pharmacia was the first to go to trial. *Id.*, ¶ 8.

¶ 5.    Over the course of a nine-day trial, the two sides presented different versions of the Medicaid reim-

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted. As the supreme court noted, the complaint in this case alleges violations dating back to 1992. *State v. Abbott Labs.*, 2012 WI 62, ¶ 1 n.1, 341 Wis. 2d 510, 816 N.W.2d 145. The action was then filed in 2004, *see id.*, ¶ 8, and the trial occurred in 2009. We cite to the 2009–10 version of the statutes unless otherwise noted because the relevant portions are the same in the 2009–10 version as they were in the relevant versions.

bursement system and Pharmacia's role in it. *Id.*, ¶ 10. The State contended that Medicaid did not have sufficient staff or resources to collect the information necessary to calculate proper reimbursement rates, so it was dependent on assistance from companies like Pharmacia. *Id.*, ¶ 11. The solution that emerged in Wisconsin and other states was for manufacturers like Pharmacia to report certain figures relating to the sales of their products and for Medicaid to use those figures to calculate reimbursements. *Id.*, ¶ 12. The most important of those figures was AWP, which Pharmacia provided to First DataBank, an independent company that organized and disseminated information regarding the pharmaceutical industry to Medicaid. *Id.* Medicaid then plugged AWP into its reimbursement formula. *Id.*

¶ 6.　According to the State, during the early days of Medicaid, AWPs tended to reflect what their name implies—the average price paid by the pharmacies—and Medicaid was able to simply reimburse pharmacies those amounts. *Id.*, ¶ 13. Over time, the manufacturers began reporting inflated AWPs in order to "market the spread." *Id.*, ¶ 14. Manufacturers reported inflated AWPs to Medicaid and Medicaid then paid the pharmacy more for the drug than what the pharmacy paid the wholesaler. *Id.* This practice gave pharmacists an incentive to buy products that had the most inflated AWPs because those products gave them the most profit. *Id.* Thus, manufacturers would "market the spread" and report more and more dramatically inflated AWPs over time. *Id.*

¶ 7.　Medicaid and other officials in Wisconsin knew that AWPs were no longer an accurate barometer of what pharmacies were paying wholesalers for drugs. *Id.*, ¶ 15. But the State was confronted with inconsistent and often contradictory information, with considerable disagreement as to how far AWPs were from actual

wholesale prices. *Id.* Because of that, the State was forced to guess as to a reasonable percentage to subtract from AWP in order to derive reimbursement amounts. *Id.* And the State erred on the side of generosity to ensure that no supplier was shortchanged, so payments were almost universally too high. *Id.* Because of that, manufacturers and everyone else in the supply chain profited from the inflated AWPs. *Id.* The State maintains that if officials had known true AWPs, they would have simply reimbursed pharmacies at those prices. *Id.*, ¶ 17.

¶ 8. Pharmacia's account differs significantly from the State's. *Id.*, ¶ 18. It claims that AWPs have always been, and continue to be, benchmark figures. *Id.* They were never intended to reflect actual prices or averages. *Id.* The State knew that, and it knew that pharmacists were profiting from reimbursements. *Id.* Those profits are not evidence of fraud; instead, they are necessary and required by federal law to ensure pharmacy participation in Medicaid. *Id.* Furthermore, true wholesale prices are no more accessible to Pharmacia than to the State because those prices are between wholesalers and their pharmacy customers. *Id.*, ¶ 19. Pharmacia calculated its AWPs based on wholesale acquisition cost—the amount that wholesalers paid for its products. *Id.*

¶ 9. Moreover, the AWPs relied on by the State were not from Pharmacia but from First DataBank, which was committed to independent verification of the AWPs it provided to the State by conducting surveys of wholesalers. *Id.*, ¶ 20. Pharmacia was not responsible for AWPs published by First DataBank. *Id.* And if the State had wanted other pricing information, it could have acquired it. *Id.*, ¶ 21. Instead it chose to use AWP, knowing what it was and was not. *Id.* The State also could have gathered information itself rather than

relying on First DataBank. *Id.* It could have even asked Pharmacia for the information it wanted, which it never did. *Id.*

¶ 10.   Pharmacia also emphasizes that the Medicaid reimbursement formulas were a product of the political process. *Id.*, ¶ 22. Each time a budget was prepared, various government officials would recommend lowering the rates to generate taxpayer savings and pharmacy lobbyists would vigorously counter those recommendations by claiming that AWPs were more accurate than alleged and that reductions would force pharmacies to withdraw from Medicaid. *Id.* The legislature and governor took all of that information into account in coming up with the formulas. *Id.* Pharmacia contends that it should not be punished for political decisions made by the State. *Id.*

¶ 11.   The jury found in favor of the State and awarded substantial damages plus attorneys' fees for the State. *Id.*, ¶ 23. The recent supreme court decision resolved three questions:   (1) whether the State was entitled to a jury trial, (2) whether the damages were based on impermissible speculation by the jury, and (3) whether the circuit court properly reduced the number of violations. *Id.*, ¶ 24. In each instance, the supreme court affirmed the trial court's decision. *Id.*

¶ 12.   Pharmacia's remaining issues after the supreme court's decision include whether separation of powers should prevent a verdict in this case, causation of damages, various evidentiary issues, and whether the award of attorneys' fees was appropriate. Issues remaining from the State's cross-appeal include the correctness of the circuit court's determination of the forfeiture amount imposed per violation and the breadth of the injunction against Pharmacia.

## DISCUSSION

¶ 13. Although a plethora of issues remain to be decided, many of them revolve around a central theme: the debate over the degree to which the damages were the product of a political decision by the legislature and other players as opposed to being caused by fraud on the part of Pharmacia. The answer to one of our certification questions—whether the jury was required to speculate as to the existence of damages based on fraud—is part of that central theme. Pharmacia's argument on that issue was that the jury was required to speculate as to damages because the State did not prove that the legislature would have acted differently with accurate AWP. The precursor to that argument is that the legislature did what it did with its eyes open, understanding that it was affording pharmacies a profit. Although we acknowledge the supreme court's admonition that its opinion is not meant to resolve the remaining issues, we cannot and do not divorce ourselves entirely from its commentary related to that central theme.

### Deception/Causation

¶ 14. As we already explained, the State sued Pharmacia under two fraud statutes—the DTPA and the Medicaid fraud statute. Pharmacia first argues that no fraudulent statements were made because the State was aware that AWPs did not represent actual average wholesale prices. It contends that because of the State's knowledge, the State cannot prove that "untrue, deceptive, or misleading" statements were made or that they caused damage. *See* Wis. Stat. § 100.18. The supreme court was explicit in its refusal to decide this issue; nonetheless, our conclusion is based on the same facts

580

and reasoning it used in determining that the jury did not have to speculate as to damages. *See Abbott,* 341 Wis. 2d 510, ¶¶ 1 n.2, 58 n.15.

■

¶ 15.   Pharmacia frames its argument in terms of whether the State's statutory claims should have been dismissed as a matter of law. This is a challenge to the sufficiency of the evidence to go to the jury rather than a challenge to the sufficiency of the evidence to support the jury's verdict. *See Foseid v. State Bank of Cross Plains,* 197 Wis. 2d 772, 783–84, 541 N.W.2d 203 (Ct. App. 1995). In such cases, we view the evidence in the light most favorable to the party against whom the motion was made. *Id.* at 783. However, we will not reverse the trial court's decision to send the question to the jury unless that decision was clearly wrong. *Id.*

¶ 16.   The problem with Pharmacia's argument on this issue is that it relies on its own characterization of disputed facts—that the State "knew" that AWPs were inflated and chose to give pharmacies a profit by using the number anyway. As the supreme court noted in its opinion, there is another reasonable view of the evidence that supports the State's case and the jury's verdict. *See Abbott,* 341 Wis. 2d 510, ¶¶ 71–72.

¶ 17.   Generally speaking, the State presented evidence that although various state officials understood that AWPs were inflated, when that information was taken to the legislature it was vigorously contested by the pharmacy lobby and other sources. More specifically, Amie Goldman, a former analyst with the Legislative Fiscal Bureau, testified that both her agency and legislators were unsure how closely AWPs tracked actual wholesale prices because of conflicting input from different actors. *See id.,* ¶ 64. She further testified that if accurate information had been provided, her analysis

would not have been necessary because the legislature would have reimbursed pharmacies based on actual wholesale prices. *Id.* As the supreme court observed, her testimony "substantially bolstered the State's position that inflated AWPs caused Wisconsin to overpay for Medicaid drugs." *Id.*

¶ 18. In addition to Goldman's testimony, the State presented evidence that when the office of the inspector general (OIG) recommended increasing the amount by which AWP was reduced in the reimbursement formula based on the inflation of AWPs, the legislature did so. *Id.*, ¶ 63. The supreme court held that this evidence strongly supported the jury's conclusion that Wisconsin would have paid prices in line with wholesale prices if accurate information had been available, and we agree. *See id.*, ¶¶ 63, 67. The supreme court also pointed to other witness testimony along the same lines in support of the award of damages. *Id.*, ¶¶ 63–67.

■

¶ 19. Pharmacia countered the State's evidence by presenting evidence showing that certain state officials received actual pricing information and that the legislature had at various points declined to reduce reimbursement rates. *Id.*, ¶ 68 & n.17. This amounts to an argument that the State was not deceived as a matter of law simply because it was presented with some accurate information regarding the inflation of AWPs. That argument cannot prevail. *See id.*, ¶ 70. Although the reimbursement rate reflects a general consensus by state officials that AWPs were inflated *to some degree,* there was great uncertainty as to the degree of inflation. *Id.* We agree with the supreme court that "[t]he jury had ample evidence to credit suggesting that Wisconsin officials did not know with certainty

actual wholesale prices, that Pharmacia's published prices provided the basis for its reimbursement rates, and that Medicaid paid more than it intended to and rightfully owed as a consequence." *Id.*, ¶ 71. In other words, the State was deceived by Pharmacia's AWPs, which did not represent average wholesale prices.[2]

¶ 20. Regarding causation, Pharmacia argues that "reasonable reliance" is a component of causation that the State cannot prove because of its knowledge that AWPs were inflated. *See Novell v. Migliaccio*, 2008 WI 44, ¶¶ 49–50, 309 Wis. 2d 132, 749 N.W.2d 544 (Reasonable reliance is not an element of a Wis. Stat. § 100.18 claim, but it is sometimes relevant to the determination of causation—whether the representation materially induced the plaintiff's loss.). In other words, since the State knew that AWPs were inflated to some degree and chose to use them—as opposed to another number—its continued reliance on AWP was not reasonable and therefore the false statements did not materially induce loss. We reject this argument as well. As we already noted, although various state officials were aware that AWPs were likely inflated to some degree, they did not know the extent of the inflation. Furthermore, the legislature acted on its knowledge

---

[2] Pharmacia also argues against the application of Wis. Stat. § 100.18(10)(b), which makes statements per se deceptive if they "represent the price of any merchandise as a manufacturer's or wholesaler's price, or a price equal thereto, unless the price is not more than the price which retailers regularly pay for the merchandise." We do not address this argument because we reject Pharmacia's more general argument that the State cannot prove deception—so regardless of the applicability of § 100.18(10)(b), the State proved that Pharmacia violated § 100.18 by making misleading statements in the form of inflated AWPs.

that the AWPs were inflated by discounting them by a certain percentage in the reimbursement formula. Under those circumstances, there is nothing unreasonable about the legislature's reliance on AWP.

*Interpretation of* Wis. Stat. *§ 49.49(4m)*

¶ 21. The bulk of Pharmacia's arguments regarding Wis. Stat. § 49.49(4m) are the same as its arguments against the application of Wis. Stat. § 100.18—that because the State knew that AWPs did not represent average wholesale prices, no deception occurred. We will not address those arguments a second time. In addition, however, Pharmacia points out that under § 49.49(4m)(a)2., to be actionable, a false statement must be "for use in determining *rights* to a benefit or payment." (Emphasis added.) Pharmacia contends that in this case, the State's case is based on AWP's effect on the *amount* of reimbursement a pharmacy has a right to receive, so § 49.49(4m)(a)2. is inapplicable. It points out that statutes imposing forfeitures are to be strictly construed. *See State v. James*, 47 Wis. 2d 600, 602, 177 N.W.2d 864 (1970).

¶ 22. The applicability of Wis. Stat. § 49.49(4m)(a)2. to the facts of this case is a question of law, which we review de novo. *See Pritchard v. Madison Metro. Sch. Dist.*, 2001 WI App 62, ¶ 7, 242 Wis. 2d 301, 625 N.W.2d 613. When interpreting statutes, we look first to the plain language of the statute. *State ex rel. Kalal v. Circuit Court for Dane Cnty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. We only consult extrinsic sources if the statutory language is ambiguous. *Id.*, ¶ 46. In addition, as Pharmacia points out, when a statute is penal in nature, it is to be strictly construed. *See State v. Kittilstad*, 231 Wis. 2d 245, 267, 603 N.W.2d 732 (1999).

However, "the rule of strict construction of penal statutes does not apply unless a statute is ambiguous, and it cannot be used to circumvent the purpose of the statute." *Id.*

¶ 23. We agree with the State that Wis. Stat. § 49.49(4m)(a)2. unambiguously applies to the amount of payment as well as the right to be paid. BLACK'S LAW DICTIONARY includes the following definition of "right": "[t]he interest, claim, or ownership that one has in tangible or intangible property." BLACK'S LAW DICTIONARY 1347 (8th ed. 2004). Using that definition, we need not look further than the plain language of § 49.49(4m)(a)2. The phrase "rights to a benefit or payment" obviously includes the amount of payment one has the right to receive, not simply the right to receive payment versus no right to receive payment. There is no need to apply the rule of strict construction in this case because the meaning of § 49.49(4m)(a)2. is plain. *See Kittilstad,* 231 Wis. 2d at 267.

### Separation of Powers/Justiciability

¶ 24. Pharmacia contends that the State's claims are not justiciable and are barred by separation of powers because the legislature made a political decision to reimburse pharmacies at a rate that paid them a profit. Both are questions of law, which we review de novo. *See Olson v. Town of Cottage Grove,* 2008 WI 51, ¶ 39, 309 Wis. 2d 365, 749 N.W.2d 211, and *State v. Dums,* 149 Wis. 2d 314, 320, 440 N.W.2d 814 (Ct. App. 1989). Pharmacia argues that the judicial branch has no right to interfere with or comment on the legislative branch's decision to use AWP. Once again, Pharmacia

relies on its central assertion that the legislature knew AWPs were inflated and chose to use them anyway.

¶ 25.  As the State points out, this case does not change the reimbursement rate set by the legislature or take away from the profits pharmacies received as a result. All this case does is hold a private defendant liable for violating a statute, resulting in false numbers being inserted into the reimbursement formula. When viewed in that light, there is no judicial interference with or commentary on any legislative decision to use AWP to afford pharmacies a profit. But more importantly, as we already explained, the supreme court's holding that there was evidence to support the jury's verdict regarding the existence or damages based on fraud is indistinguishable from a holding that there was evidence to support the State's theory that the legislature did not act with a full understanding of the profit it was affording pharmacies. Under that theory of the case, there was no judicial interference with a legislative decision—and thus no issue of justiciability or separation of powers—because the legislature was deceived when the decision was made.

*Failure to Mitigate Damages*

¶ 26.  Pharmacia next argues that once the case was allowed to go to a jury, the jury should have been asked whether the State had "failed to mitigate the damages it claimed, and if so, to what extent." The trial court refused the instruction on the basis that it was not really a mitigation defense because if the State had "learned of the fraud and continued to overpay," as alleged by Pharmacia, "it is a noncausal and no liability situation." We agree.

586

¶ 27. Pharmacia's mitigation of damages argument is yet another angle of Pharmacia's argument that the State knew enough about the inflation of AWPs to have changed its formula. Pharmacia cannot prevail with that reasoning no matter how many different ways it is framed. Regarding this issue, Pharmacia states that "[h]ere, the State's 'damages' resulted from its own choice to reimburse based on AWP, knowing that AWP exceeded pharmacists' actual costs, and knowing that it was providing pharmacists with a profit." As the supreme court noted, "if there was insufficient evidence to sustain the State's claim that it would have paid lower AWPs if they had been published, then the damage award would not be *lower*, it would be zero." *Abbot t*, 341 Wis. 2d 510, ¶ 58 n.15. Put another way, if the legislature had accurate enough information about the inflation of AWPs to be responsible for reducing its damages by a particular amount, it had enough information to reduce its damages to zero. The jury rejected that view of the evidence when it found damages based on the inflated AWPs. And the supreme court held that the jury's award of damages was supported by credible evidence. We need not say more.

## Duplicative Damages

¶ 28. Pharmacia complains that two of the special verdict questions asked the jury to assess damages for overlapping time periods. In the first, the jury was asked to consider damages incurred after 2001 based on violations of WIS. STAT. § 100.18 and, in the second, the jury was asked to determine the amount of damages incurred after 1994 based on violations of WIS. STAT. § 49.49. The State responds by pointing out that Pharmacia did not object to the language used in the special verdict questions at the time and on one occasion opposed a clarifying answer to a jury question regarding the two time periods.

587

¶ 29. According to Wis. Stat. § 805.13(3), "[f]ailure to object at the [verdict] conference constitutes a waiver of any error in the proposed instructions or verdict." We have not found an objection to the special verdict questions in the record and Pharmacia has not pointed us to where there is one, despite the State pointing out its failure to object. Pharmacia has made no attempt to explain its failure to move to correct the alleged error before the questions went to the jury. We will not review an alleged error that Pharmacia could have corrected in time to avoid a potential retrial, but did not. *See generally LaCombe v. Aurora Med. Grp., Inc.*, 2004 WI App 119, ¶¶ 5–15, 274 Wis. 2d 771, 683 N.W.2d 532 (explaining that § 805.13(3) applies waiver to cases where the objection is to the form of the verdict question).

### Evidentiary Issues

¶ 30. Pharmacia objects to the admission of four pieces of evidence: (1) an email that it alleges should not have been admitted because it was hearsay; (2) OIG Compliance Program Guidance for Pharmaceutical Manufacturers dated April 18, 2003; (3) RedBook Product Verification Sheets; and (4) a National Association of Medicaid Fraud Control Units (NAMFU) letter.[3] Our

---

[3] Pharmacia also complains about the admission of unspecified documents that it claims were not properly authenticated, as well as testimony about those documents by corporate designees who had no firsthand knowledge of their contents. We do not address those arguments in detail because Pharmacia does not tell us which documents or testimony it is referring to or why the admissions should be grounds for reversal. As we will explain in the body of this opinion, a new trial based on erroneously admitted evidence is appropriate only if there is a reasonable possibility that the error contributed to the outcome of the proceeding. *See Martindale v. Ripp*, 2001 WI 113, ¶¶ 30–32, 246 Wis. 2d 67, 629 N.W.2d 698. Without any argu-

standard of review is the same for all of the evidentiary issues.

¶ 31.   We review the trial court's evidentiary decisions for erroneous exercise of discretion. *State v. Pharr*, 115 Wis. 2d 334, 342, 340 N.W.2d 498 (1983). We will uphold an evidentiary ruling if we conclude that the trial court "examined the relevant facts, applied a proper standard of law, used a demonstrated rational process, and reached a conclusion that a reasonable judge could reach." *State v. Walters*, 2004 WI 18, ¶ 14, 269 Wis. 2d 142, 675 N.W.2d 778. In order for us to order a new trial based on erroneously admitted evidence, there must be a reasonable possibility that the error contributed to the outcome of the proceeding, sufficient to undermine our confidence in the outcome. *Martindale v. Ripp*, 2001 WI 113, ¶¶ 30–32, 246 Wis. 2d 67, 629 N.W.2d 698. We address each evidentiary argument in turn below.

¶ 32.   *Email:*   The email Pharmacia complains about was written by Don Dietz, a consultant hired by Pharmacia. In the email, Dietz describes a process by which drug manufacturers were able "to indicate they did not establish AWP in the market." Prior to trial, Pharmacia objected to its admissibility based on it being hearsay. The trial court ruled that it would be admissible to prove corporate knowledge and possibly as an admission, subject to the State proving Dietz's

ment from Pharmacia as to why this alleged error warrants reversal based on the content of the evidence it claims was erroneously admitted, we see no reason to address the issue on the merits. *See Schonscheck v. Paccar, Inc.*, 2003 WI App 79, ¶ 20, 261 Wis. 2d 769, 661 N.W.2d 476 (we need not address issues on appeal that are inadequately briefed).

status as an agent of Pharmacia. Pharmacia does not dispute that it could be admitted for the purpose of showing corporate knowledge but argues that the State used the email during closing argument to show the truth of the matter asserted.

¶ 33.  The State argues that Pharmacia's objection to the email "became moot at trial when one of the Pharmacia recipients of the email was shown it and *agreed* with the key statements Pharmacia wanted excluded." In its reply brief, Pharmacia does not argue that the testimony cited by the State was not on point or that it was erroneously admitted. After reviewing the email and the testimony cited by the State, we agree with the State—to the extent that it was error to admit the email, that error was harmless because the evidence was corroborated by admissible evidence in the record. *See State v. Stuart*, 2005 WI 47, ¶ 41, 279 Wis. 2d 659, 695 N.W.2d 259. Because of that, its admission in no way undermines our confidence in the outcome of these proceedings. *See Martindale*, 246 Wis. 2d 67, ¶ 32.

▬

¶ 34.  *OIG Guidance:*  The next piece of evidence Pharmacia argues was erroneously admitted is a redacted version of the OIG Compliance Program Guidance for Pharmaceutical Manufacturers. It appears that the content relied on by the State was a section indicating that state programs' drug reimbursement rates used data furnished by manufacturers and did so with the expectation that it was complete and accurate. Pharmacia complains that although the Guidance is not law, "the court allowed the State to argue that Pharmacia's conduct . . . was illegal because it violated federal advice." The State responds that the evidence was relevant to show Pharmacia's knowledge of state policies, not state law. That information was in turn

relevant to whether Pharmacia acted with the requisite knowledge under WIS. STAT. § 49.49(4m)(a)2. We see no problem with the admission of the OIG Guidance for that purpose.

¶ 35. *RedBook Evidence:* Pharmacia next complains that the trial court denied its motion to exclude evidence related to RedBook, a price publisher. The objected-to evidence shows that Pharmacia verified the numbers published by RedBook prior to publication. Pharmacia contends that because Medicaid relied only on First DataBank, information regarding other publishers was not relevant. The State responds that the evidence was relevant because publishing false AWPs in any compendium was unlawful under WIS. STAT. § 100.18 and because the State presented evidence that Pharmacia used a similar verification process with First DataBank as with RedBook, so the RedBook evidence was relevant to show what that process was. Pharmacia does not directly refute those relevancy arguments in its reply brief, instead repeating its complaint that "documents from a data publisher that were never shown to have been published in Wisconsin and that Wisconsin did not use were not relevant." We see no problem with admissibility on the bases asserted by the State.

¶ 36. *NAMFU Letter:* In 2002, the National Association of Medicaid Fraud Control Units sent Wisconsin a letter stating that a current national investigation had found AWPs significantly inflated as to 400 drugs, including 47 Pharmacia drugs. It also stated that First DataBank had agreed to base its AWP reporting practices on market prices, rather than the prices identified by manufacturers, and that states should take appropriate action in response. Pharmacia argues that the

591

letter was irrelevant and allowed the State to "improperly question witnesses about an outside investigation" and "argue that a federal agency had determined Pharmacia's prices to be false and inflated." It claims that the NAMFU letter was both irrelevant and prejudicial.

¶ 37. The State points out that before the letter could be admitted, references to fraud were redacted. The State used it to show that after receiving the letter, the State worked with First DataBank to get the accurate AWPs into its system. The State claims that the letter and the State's response to it were important to the State's proof that if it had had accurate AWPs, it would have used them. We agree with the State and the trial court that the redacted letter was relevant and not unduly prejudicial.

*Attorneys' Fees and Costs*

¶ 38. The trial court awarded approximately $6.5 million in attorneys' fees and over $300,000 in costs. Pharmacia argues that these awards were based on a misapplication of the law regarding attorneys' fees. We review the trial court's award of attorneys' fees for erroneous exercise of discretion. *Kolupar v. Wilde Pontiac Cadillac, Inc.*, 2004 WI 112, ¶ 22, 275 Wis. 2d 1, 683 N.W.2d 58. If the trial court misapplied the law regarding attorney fees as Pharmacia alleges, that would be an erroneous exercise of discretion. *See id.*

¶ 39. Pharmacia first argues the State is not entitled to recover attorneys' fees based on work done by a private firm because there was no contract to hire a private firm as required by Wis. Stat. § 14.11(2)(b). Paragraph 14.11(2)(b) reads as follows:

> When special counsel is employed, a contract in writing shall be entered into between the state and such counsel, in which shall be fixed the compensation to be paid such counsel by the state. The contract shall be executed in behalf of the state by the governor, and shall be filed in the office of the secretary of state. Such compensation shall be charged to the special counsel appropriation in [WIS. STAT. §] 20.455(1)(b).

It is undisputed that as of 2007, there was a special counsel agreement with the firm specifically approving the 2004 filing of the suit. In addition, there is a 2004 letter from the governor's office stating that the firm could work on the suit. The application of that agreement is complicated by the existence of a second letter stating that the firm could only represent private citizens.

¶ 40. Citing WIS. STAT. § 14.11(2), Pharmacia alleges that "[b]efore September 2007, there was no attorney-client relationship between plaintiff and private counsel, precluding the State's right to recover fees for this period." However, we see nothing in the wording of the statute precluding the State from entering into a contract that covers past work by private counsel. Because of that, we do not see how the 2007 agreement fails to comply with § 14.11(2). And even if we agreed with Pharmacia's interpretation of § 14.11(2), we question whether the remedy for violating it would be to relieve Pharmacia from its obligation to pay attorneys' fees.

¶ 41. Pharmacia next contends that "under WIS. STAT. § 165.25(1m), the State can incur litigation expenses only through its budgetary appropriation, which undergoes legislative approval." Instead, Pharmacia complains that in this case, special counsel advanced expenses and looked to the defendant to recover them.

Section 165.25 is titled "Duties of the department of justice." Subsection (1m) is titled "Represent state in other matters" and states that "[a]ll expenses of the proceedings shall be paid from the appropriation under [Wis. Stat. §] 20.455(1)(d)." Pharmacia's complaint is apparently that expenses related to this litigation were paid by a private law firm rather than by taxpayers.

¶ 42. Put simply, since special counsel paid the expenses of the litigation, the State did not incur any expenses that Wis. Stat. § 165.25(1m) requires be paid from the appropriation. It would be nonsensical to interpret § 165.25(1m) as prohibiting the State from entering into a contract such as it did here, where litigation expenses which would normally be paid for with taxpayer dollars are instead paid for by special counsel who agrees to recover the expense only from defendants through an award of costs. But more importantly, as with the attorneys' fees for private counsel, even if we agreed with Pharmacia's interpretation of the statute, we fail to see how the remedy for a violation would involve Pharmacia not owing the costs related to this litigation.

¶ 43. Finally, Pharmacia argues that Wis. Stat. §§ 100.18 and 49.49 do not allow the State to recover some of the attorneys' fees awarded in this case. Regarding § 100.18, it argues that under that statute, "a plaintiff may recover fees and costs only to the extent plaintiff has incurred fees and costs and/or is contractually obligated to pay fees and costs to its counsel." For that proposition, it cites to § 100.18(11)(b) and *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 503–04, 577 N.W.2d 617 (1998). Section 100.18(11)(b) states that plaintiffs may recover "costs, including reasonable attorney fees." And the passage in *Gorton* actually discusses with approval a case holding that plaintiffs "are entitled

to an attorney fees award even when they are represented at no charge by a legal services organization." *Gorton*, 217 Wis. 2d at 504 (quoting *Shands v. Castrovinci*, 115 Wis. 2d 352, 361, 340 N.W.2d 506 (1983)). We do not find support for the limitation suggested by Pharmacia in § 100.18(11)(b) or in *Gorton*. To the contrary, both § 100.18(11)(b) and *Gorton* support the idea that the award of attorney fees based on private counsel's work was appropriate in this case.

¶ 44.   Regarding WIS. STAT. § 49.49, Pharmacia points to the following language in § 49.49(6):   "[T]he court may award the department of justice the reasonable and necessary costs of investigation, an amount reasonably necessary to remedy the harmful effects of the violation and the reasonable and necessary expenses of prosecution, including attorney fees, from any person who violates this section." According to Pharmacia, because the above section distinguishes between costs of investigation and costs of prosecution, and because only prosecution carries the right to attorneys' fees, only the department of justice may receive an award pursuant to that provision. This interpretation of the statute makes no sense. Section 49.49(6) permits recovery of "the reasonable and necessary expenses of prosecution, including attorney fees." Pharmacia does not argue that it was unreasonable or unnecessary for the department of justice to work with private counsel in the prosecution of this case. Indeed, given the complexity of this case, we can understand why that point has not been argued. Under the circumstances, § 49.49(6) permits recovery of attorneys' fees for the private counsel hired by the State.

¶ 45.   Pharmacia also argues that the trial court improperly applied the lodestar method to determine

595

the attorneys' fee award. *See Kolupar*, 275 Wis. 2d 1, ¶¶ 29–30. The lodestar method involves multiplying the attorneys' reasonable hours by the reasonable rate for the work and then adjusting that number according to other factors, one of which is the relationship between the extent of success and the award of attorney fees. *Id.*; *Hensley v. Eckerhart*, 461 U.S. 424, 439–40 (1983). Pharmacia argues that the trial court erred in considering the department of justice attorneys' hours worked because they did not keep track of them at the time. Instead, they reconstructed work hours after the fact based on correspondence, emails, and pleadings. Pharmacia also argues that the trial court should have reduced the award because the State has spent time on litigation against several pharmaceutical company defendants but has so far only been successful against Pharmacia.

¶ 46. Both of Pharmacia's lodestar arguments are untenable. First, we see no reason why the department of justice attorneys' reconstructed hours could not form the basis for the trial court's determination of the reasonable hours and rate for the case. Pharmacia supports its bare-bones argument on the issue by citing to *Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, 261 Wis. 2d 4, 660 N.W.2d 666. In that case, the supreme court reversed the trial court's award of attorneys' fees, stating:

> A list of monthly totals paid for legal services broadly grouped across areas of representation does not give either court enough information to employ the analysis required by Wisconsin law. As the Insurance Company argues, it is not possible to know from the affidavits the character of the work performed, how much time was spent on each type of work, and who performed the

596

> work. Without this information, a court cannot deter-
> mine whether the amount that Bradley paid per month
> was in fact reasonable.

*Id.*, ¶ 69. According to the State, the department of justice attorneys who did not keep track of their hours as they worked reconstructed them based on correspondence, emails, and pleadings. That reconstruction is far more detailed than a "list of monthly totals paid for legal services broadly grouped across areas of representation" that *Fireman's* held to be insufficient. And we see no reason why reconstructed hours cannot show "the character of the work performed, how much time was spent on each type of work, and who performed the work" as required by *Fireman's. See id.*

¶ 47.  We likewise see no problem with the trial court's alleged failure to consider the State's success against only one of more than thirty defendants. First, we point out that as of yet, only one defendant has gone to trial, *see Abbott*, 341 Wis. 2d 510, ¶ 8 n.9, so the State has not been *un*successful against other defendants so much as it has not yet had the opportunity to be successful against them. Furthermore, since Pharmacia is the only defendant to have gone to trial so far, the fees incurred to date presumably relate to the issues and defendant at hand—further fees incurred in the future, prosecuting other defendants, will be part of those cases.

¶ 48.  Most importantly, as we explained at the outset, the award of attorney fees is a discretionary decision on the part of the trial court. *See Kolupar*, 275 Wis. 2d 1, ¶ 22. The trial court noted in its decision that the State had submitted affidavits supporting its contention that its request was "shorn of fees incurred litigating cases against other defendants except to the

extent that the work was reasonably necessary to advance the case against Pharmacia." That is sufficient to show it exercised discretion regarding its ability to reduce the award based on the State's success against only one defendant. We need not look further.

### Cross-Appeal—Forfeiture Amount

¶ 49. WISCONSIN STAT. § 49.49(4m)(b) states that "[a] person who violates this subsection may be required to forfeit not less than $100 nor more than $15,000 for each statement, representation, concealment or failure." The State complains that when the trial court decided to impose a $1000 per violation fine, it considered improper mitigating factors. Since § 49.49(4m)(b) does not identify specific factors the court must consider in determining the forfeiture amount, the standard of review for this issue is whether the trial court erroneously exercised its discretion. *See State v. Schmitt*, 145 Wis. 2d 724, 730, 429 N.W.2d 518 (Ct. App. 1988). As with the discretionary decisions we have already analyzed, we will not reverse the trial court so long as it "examined the relevant facts, applied a proper view of the law, and, using a demonstrated rational process, reached a conclusion that a reasonable judge could reach." *Id.* at 729.

¶ 50. Although the State acknowledges in its brief that WIS. STAT. § 49.49(4m)(b) does not list factors to be considered, it argues that the trial court erred in considering "its belief that Pharmacia would pass a larger forfeiture amount on to purchasers of its drugs in the marketplace, and its view that Wisconsin's knowledge of the inflation in AWP mitigated Pharmacia's

598

conduct." We have read the trial court's decision. It is well reasoned. The factors highlighted by the State are part of the trial court's more general reasoning—that the maximum possible forfeiture, which would amount to $68,670,000, "would be unjustifiable and rank overkill on these facts" and that the minimum forfeiture, which would amount to $457,800, "would not register so much as a blip on Pharmacia's multi-billion dollar annual fiscal radar screen." The trial court viewed its award as a balance between those possible extremes and we see no erroneous exercise of discretion within its reasoning, including the factors highlighted by the State.

*Cross-Appeal—Injunction*

■

¶ 51.  The State complains that the trial court failed to order injunctive relief that it requested. The trial court instead issued an injunction essentially ordering Pharmacia to obey Wis. Stat. §§ 100.18 and 49.49 as written. It refused to issue the more specific injunction requested by the State.[4] Once again, this is a discretionary decision on the part of the trial court that we will not reverse absent an erroneous exercise of discretion. *State v. Seigel*, 163 Wis. 2d 871, 889, 472 N.W.2d 584 (Ct. App. 1991).

■

¶ 52.  The State argues that the trial court's reasoning regarding the injunction decision was based on

[4] The details of the State's requested injunction are not relevant to our analysis, but it amounts to ordering Pharmacia to issue only accurate AWPs and wholesale acquisition costs, check pricing compendiums for accuracy in published prices for generic products, and verify the accuracy of reported prices for generic products to the attorney general not less than quarterly.

irrelevant and/or inappropriate factors, including the harm to consumers other than Medicaid and the effect of an injunction against Pharmacia on the drug market as a whole. We have read the transcript of the trial court's decision and we simply disagree that the factors it considered were irrelevant or inappropriate. The trial court enjoined Pharmacia from further violations of the law but refused to order it to obey the law using the particular mechanisms proposed by the State. Its decision clearly reflects a concern that the more specific injunction requested by the State was inappropriate based on the facts and scope of the case and the possible impact of a more detailed injunction outside of this particular case. These considerations were not inappropriate and do not form a basis for us to reverse the trial court's decision. The State's arguments amount to an assertion that the trial court *could have* legally issued the injunction it requested. While that may be true, it does not automatically follow that the trial court erroneously exercised its discretion in refusing to do so.

## Cross-Appeal—Materiality

¶ 53. Although the supreme court upheld the trial court's reduction to the number of violations found by the jury, the State argues that there is one remaining issue in terms of how the number of violations was calculated by the trial court: the trial court's decision that false AWPs were "material" only if Wisconsin actually paid a claim by using a particular AWP. *See* Wis. Stat. § 49.49(4m)(a)2. It argues that the statutory language—prohibiting false statements made "for use in determining rights to a benefit or payment"— includes false AWPs that were received by the State regardless of whether they were actually used by the State for reimbursement.

¶ 54. We fail to see how this issue was not decided by the supreme court's decision. In discussing whether the trial court properly reduced the jury's answer to the question regarding violations, the supreme court framed the issue as follows: "Having determined that the circuit court was required to reduce the number of violations, the question remains as to whether [the trial court] reduced the number in the correct amount." *Abbott*, 341 Wis. 2d 510, ¶ 105. It then goes on to explain that it had already rejected one proposed theory—that the number of violations should be equal to the number of times that Medicaid overpaid for a drug. *Id.*, ¶ 106. The remaining alternatives it addressed were (1) whether "a violation occurred every time Pharmacia reported an inflated AWP . . . to [First DataBank] which was then conveyed to Medicaid" or (2) whether "a violation occurred every time [First DataBank] transmitted an inflated AWP to Medicaid and Medicaid then relied on it at least once in the reimbursement of a pharmacy." *Id.*

¶ 55. Ultimately, the supreme court rejected the first remaining theory in favor of the second. It explained that "the fraud that the jury found Pharmacia liable for committing could not have been realized until the inflated AWPs reached Medicaid through [First DataBank]; *for until that happened, the inflated AWPs could not have played any role in the calculation of reimbursements, where the injury occurred." Id.*, ¶ 109 (emphasis added). Although the State is correct in pointing out that the supreme court never directly addressed materiality, its holding that the number found by the trial court was correct forecloses the State's argument that the trial court's method of counting violations was incorrect. The supreme court's decision leaves no room for us to order a recount of the number of violations based on the State's theory.

## CONCLUSION

¶ 56. After reviewing the plethora of issues argued by the parties and not directly addressed in the supreme court's opinion, we conclude that the trial court's rulings should be affirmed in their entirety.

¶ 57. No costs awarded to either party.

*By the Court.*—Judgment affirmed.