# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2014-CA-01213-SCT

*WATSON LABORATORIES, INC. AND ACTAVIS*
*PHARMA, INC. f/k/a WATSON PHARMA, INC.*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/14/2014 |
| TRIAL JUDGE: | HON. HOLLIS McGEHEE |
| TRIAL COURT ATTORNEYS: | GEOFFREY C. MORGAN |
| | TIMOTHY HOWARD |
| | HAROLD PIZZETTA |
| | RONNIE MUSGROVE |
| | LERAY McNAMARA |
| | FRANK JOHN KOLB, IV |
| | CLINTON C. CARTER |
| | JASON D. WATKINS |
| | WALKER W. JONES, III |
| | DAVID T. MARON |
| | WILLIAM N. REED |
| | DARREN M. GUILLOT |
| | LAURA SANDERS BROWN |
| | RAYMOND L. BROWN |
| | THOMAS NEAL JAMERSON |
| | LUTHER T. MUNFORD |
| | MIKE WALLACE |
| | GEORGE Q. EVANS |
| | TOM JULIAN |
| | MARK A. DREHER |
| | LEE DAVIS THAMES |
| | P. RYAN BECKETT |
| | C. MICHAEL MOORE |
| | WILLIAM F. GOODMAN, III |
| | FRANK A. WOOD, JR. |
| | KATHY K. SMITH |
| | KATHRYN H. HESTER |
| | JOHN G. SIMS, III |

|                                |                                          |
| ------------------------------ | ---------------------------------------- |
|                                | R. PEPPER CRUTCHER, JR.                   |
|                                | ROBERT D. GHOLSON                        |
|                                | JAMES R. MOZINGO                         |
|                                | NEVILLE H. BOSCHERT                      |
|                                | WILLIAM C. BRABEC                        |
|                                | RICK A. LA TRACE                         |
|                                | JOSEPH A. SCLAFANI                       |
|                                | CHRISTOPHER A. SHAPLEY                   |
|                                | CARLTON W. REEVES                        |
|                                | J. DOUGLAS MINOR                         |
|                                | RICHARD O. BURSON                        |
| COURT FROM WHICH APPEALED:      | RANKIN COUNTY CHANCERY COURT             |
| ATTORNEYS FOR APPELLANTS:       | RANDI P. MUELLER                         |
|                                | RONALD G. PERESICH                       |
|                                | JAMES W. MATTHEWS                        |
|                                | KATY E. KOSKI                            |
|                                | JOHN F. NAGLE                            |
|                                | JOHANNA M. McMULLAN                      |
| ATTORNEYS FOR APPELLEE:         | OFFICE OF THE ATTORNEY GENERAL           |
|                                | BY:  GEORGE W. NEVILLE                   |
|                                | GEOFFREY C. MORGAN                       |
|                                | JACQUELINE H. RAY                        |
|                                | S. MARTIN MILLETTE                       |
|                                | D. RONALD MUSGROVE                       |
|                                | MICHAEL S. SMITH, II                     |
|                                | BLAKE D. SMITH                           |
|                                | CHARLES G. COPELAND                      |
|                                | REBECCA S. BLUNDEN                       |
|                                | ELLEN PATTON ROBB                        |
|                                | ANDY LOWRY                               |
| NATURE OF THE CASE:             | CIVIL - STATE BOARDS AND AGENCIES        |
| DISPOSITION:                    | ON DIRECT APPEAL: AFFIRMED.  ON CROSS-APPEAL: AFFIRMED - 01/11/2018 |
| MOTION FOR REHEARING FILED:     |                                          |
| MANDATE ISSUED:                 |                                          |

**EN BANC.**

**CHAMBERLIN, JUSTICE, FOR THE COURT:**

¶1.     In 2005, the State of Mississippi filed suit against more than eighty prescription drug

manufacturers alleging, among other things, that each committed common-law fraud and violations of the Mississippi Consumer Protection Act. The allegations, which will be more thoroughly discussed, focused on whether the prescription-drug manufacturers inflated reported prices, which caused the Mississippi Division of Medicaid ("Mississippi Medicaid") to reimburse pharmacies at the inflated rates. The cases were eventually severed, so the present case and appeal involves only Watson Laboratories, Inc., Watson Pharma Inc., and Watson Pharmaceuticals, Inc. (collectively "Watson").

¶2. Following a bench trial, the Rankin County Chancery Court concluded that Watson had committed common-law fraud and had violated the Mississippi Consumer Protection Act. As a result, the chancery court awarded the State a total of $30,262,052 in civil penalties, compensatory damages, and punitive damages. The chancery court also awarded post-judgment interest of three percent on the compensatory and punitive damages. Unsurprisingly, Watson appealed, challenging the chancery court's decision; the State also has filed a cross-appeal related to damages.

¶3. The Court affirms the chancery court's judgment in favor of Mississippi Medicaid. Further, the Court holds that the ruling on the State's cross-appeal is, likewise, affirmed.

## FACTS AND PROCEDURAL HISTORY

¶4. The Center for Medicare and Medicaid Services ("CMS") administers Medicaid on the federal level, and Mississippi Medicaid administers Medicaid on the state level. Watson manufactures prescription drugs, primarily generic drugs, and these drugs then are provided by pharmacies to Medicaid patients. In order for Mississippi Medicaid to reimburse

3

pharmacies, Mississippi Medicaid is required by CMS to have an approved State Plan, which, among other things, defines the scope of services provided and how the services would be reimbursed.

¶5.     More specifically, once a pharmacist dispenses a drug to a Medicaid patient, it submits a claim form to Mississippi Medicaid, and the claim is processed.  The claim is reimbursed based on the lowest rate produced by any one of the three possible reimbursement formulas.  The three formulas are the following: 1. Federal Upper Limit; 2. the Usual and Customary charge to the general public–i.e., cash customers; and 3. the Estimated Acquisition Cost plus a reasonable dispensing fee.  The third formula is the only one at issue here.

¶6.     According to CMS regulations, the Federal Upper Limit rate is set at 150% of the lowest published price when three or more manufacturers of the particular drug are available on the market. 42 C.F.R. § 447.332(b) (2006).  A Federal Upper Limit cannot be set if there are not three or more manufacturers of the particular drug on the market. 42 U.S.C.A. § 1396r-8.  The second formula is fairly self-explanatory, referring to the usual and customary charge to the general public.

¶7.     The third formula is the primary formula discussed in the instant case.  Mississippi Medicaid defined estimated acquisition cost as the "best estimate of the price [for a drug] generally and currently paid" by pharmacies.  The estimated acquisition cost was quantified in terms of a percentage less than the average wholesale price.  Mississippi Medicaid subscribed to First DataBank and utilized the reported average wholesale prices in

4

determining the estimated acquisition costs for drug reimbursements. Watson and other drug manufacturers determined their respective average wholesale prices ("AWP")[1] and reported them to third-party publishers such as First DataBank, which then published the prices to its subscribers. For the relevant damages period (1990-2005), Mississippi Medicaid defined estimated acquisition cost as average wholesale price minus ten percent (May 1990-March 2002); average wholesale price minus twelve percent (April 2002-June 2005); and average wholesale price minus twenty-five percent (July 2005-October 2005).

¶8.    The parties' understanding of the term "average wholesale price" is the subject of the present appeal.   The State filed suit against Watson in 2005 claiming that Watson "knowingly, willfully, and/or intentionally provided or caused to be provided false and extraordinarily inflated" average wholesale prices that Watson knew Mississippi Medicaid relied upon for its reimbursement formulas. The State further explained that Watson "had a duty to report pricing information that fairly and accurately reflected the [average wholesale price] of their products rather than artificially inflated prices that fraudulently increased Mississippi Medicaid reimbursement payments to providers."   Based on the inflated average wholesale prices, the State claimed that Watson could "market the spread" to pharmacies, which encouraged pharmacies to use Watson products in order to return a

---

[1]In 2000, Watson changed the label for the figures provided from "average wholesale price" to "suggested wholesale price."  According to the chancery court, Watson admitted that this change "was a change in name only" and that "Watson . . . knew that its reported" suggested wholesale prices would be treated as average wholesale prices by First DataBank and, ultimately, Mississippi Medicaid.

greater profit, all to the detriment of Mississippi Medicaid, which was overpaying based on the reported prices. "By marketing the 'spread' on their products, [Watson] intended to induce providers to purchase [its] drugs, knowing that the larger 'spreads' would allow the provider to pocket more money from the State in the form of higher Medicaid reimbursements." "Marketing the spread" also would "increase the individual market share of their drugs, thereby increasing their own profits."

¶9. The State also argued that Watson's actions or inactions violated Mississippi's Consumer Protection Act by "intentionally committ[ing] unfair and deceptive trade practices by falsely and fraudulently advertising the [average wholesale prices] of their products well above their actual acquisition costs with the intent not to sell them as advertised" and by "intentionally misrepresenting the facts concerning the reasons for, existence of, or amounts of price reductions provided to providers." Additionally, the State claimed that Watson committed common-law fraud by knowingly misrepresenting the average wholesale prices "with the intent of inducing [Medicaid] to rely on the false information in setting prescription drug reimbursement rates." The State's amended complaint removed a large amount of the language from the initial complaint, but it still asserted that Watson had violated Mississippi's Consumer Protection Act and had committed common-law fraud. The State's second amended complaint, filed July 25, 2012, did not materially alter the allegations.

¶10. After a lengthy pretrial process, the chancery court held a bench trial in the matter starting on November 7, 2012. Both sides presented numerous witnesses and a multitude of

documents for the chancery court to consider, and on September 6, 2013, the chancery court entered its findings of fact and conclusions of law. As the chancery court explained: "The outcome of this case hinges upon the parties' understanding and the meaning of the phrase 'Average Wholesale Price' . . . ." The chancery court further explained as follows:

> The State introduced substantial evidence in support of its position that [Mississippi Medicaid] understood that the term AWP means just what it says: the Average Wholesale Prices paid to Watson by retailers for the drugs at issue. In turn, Watson introduced a voluminous amount of evidence in support of its position that the pharmaceutical industry . . . have understood for years that the term "AWP" does not mean what it says, and in fact, is a term of the trade known and acknowledged by all participants in the pharmaceutical industry . . . to reflect to mean a "suggested wholesale price" or "sticker price." Watson acknowledges that its published "AWPs" reflect a price that is higher than the average of wholesale prices paid by a retailer for Watson pharmaceuticals.

> . . .

> After carefully reviewing all of the evidence submitted by the parties on the issue of the meaning of AWP and more importantly, Watson's and [Mississippi Medicaid]'s understanding of the meaning of AWP, the evidence establishes that both Watson and [Mississippi Medicaid] understood that Watson's AWPs published in [First DataBank] that were relied upon by [Mississippi Medicaid] in determining its estimated acquisition cost reimbursement for Watson's drugs were not true average[s] of wholesale prices charged by Watson to retailers for its particular drug products.

> Having concluded that [Mississippi Medicaid] was aware that Watson's published AWPs at issue in this case represented higher prices than the average of wholesale prices being paid to Watson by retailers, the Court also concludes that the State had no knowledge during the relevant damage period of the true Average Wholesale Prices being paid by Mississippi pharmacists to Watson for drugs being dispensed through and reimbursed by Medicaid. The evidence also conclusively establishes that no employee/representative of [Mississippi Medicaid] had any idea/belief that Watson's published AWPs were inflated to the extent that they were.

. . . However, the fact that the Legislature and [Mississippi Medicaid] were discounting AWPs and continuously changing or increasing the discount to AWP for [estimated-acquisition-cost] reimbursement purposes shows that both the Legislature and [Mississippi Medicaid] were attempting (futilely as we now know) to reimburse pharmacies at a true Average Wholesale Price paid by pharmacies for drugs dispensed through Medicaid . . . .

. . . Although [Mississippi Medicaid] understood that Watson's published AWPs were higher than true Average Wholesale Prices being paid by Mississippi pharmacies, Mississippi had no idea as to the extent that Watson's published AWPs were inflated over true Average Wholesale Prices. . . . As previously noted, the State's effort was futile, and the evidence establishes that [Mississippi Medicaid's] reimbursement for [estimated acquisition cost] based upon a discount to AWP fell far short of arriving at a true AWP paid by Mississippi pharmacies. . . .

. . .

Although there may have been an understanding in the pharmaceutical industry and in [Mississippi Medicaid] that a drug manufacturer's such as Watson's published AWPs were higher than prices actually being paid by retailers for Watson's drugs, there was never an understanding by [Mississippi Medicaid] of the true prices that Mississippi pharmacies were paying for Watson's drugs.

The fact that some employees of [Mississippi Medicaid] and individuals associated with the pharmaceutical industry recognized that published AWPs were inflated does not require this Court to conclude that AWP was a term of art in the pharmaceutical industry that carried with it a particular definition. In fact, the definition(s) that Watson proposes to assign to the phrase AWP, renders the phrase completely meaningless and useless for Medicaid reimbursement purposes.

. . .

Watson argues, and the Court agrees, that Watson had no legal obligation to publish its AWPs. However, once Watson caused to be published its AWPs, Watson did have an obligation to publish true and accurate AWPs that were relied upon and used by Mississippi [Medicaid] . . . .

8

. . .

Based upon the evidence presented, this [chancery c]ourt concludes that the spread between the prices actually paid by Watson's customers for Watson's products and Watson's published AWPs for these products were important to Watson from a marketing/profit standpoint and to its customers from a profit standpoint.

. . .

If this [chancery c]ourt were to accept Watson's suggestion or urging that the term Average Wholesale Price is a technical term of art within the pharmaceutical agency which merely means a "suggested price" or "list price[,]" the effect of such a decision would be: (1) to condone Watson's conduct of causing the publication of its Average Wholesale Prices that are meaningless; (2) to permit Watson to cause to be published any price whatsoever that it chooses as its AWP for a particular drug with the published Average Wholesale Price having no relationship whatsoever to the true Average Wholesale Price of Watson's product; and (3) to permit Watson to cause to be published its Average Wholesale Prices for its drugs when the published prices are in fact, prices for which its customers never paid for Watson's drugs. . . .

. . .

. . . [t]he State has presented no evidence which shows that [Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.] . . . participated in the manufacture, sales or marketing of the drugs at issue in this litigation. . . . For this reason, the [chancery c]ourt dismisses Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc. as a Defendant from this action.

. . .

This [chancery c]ourt concludes that Watson's conduct in causing to be published AWPs that have no predictable relationship to what customers pay for its drugs while knowing Mississippi relied on this information in determining [estimated acquisition cost] is an unfair and deceptive trade or practice within the meaning of Mississippi's Consumer Protection Act.

. . .

9

[With respect to the common-law fraud claim,] [t]he [chancery c]ourt concludes that Watson made a representation by causing its AWPs to be published by [First DataBank] with the intent that [First DataBank] publish this information to third parties such as [Mississippi Medicaid]. . . . [Further, t]he evidence establishes that [Mississippi Medicaid] believed that Watson's published AWPs were at least reasonably close to the average prices its customers were paying for Watson's drugs . . . .

. . .

Watson's conduct caused Mississippi to overpay for its prescription drugs and as a result, Mississippi sustained proximate injury and damages as a result of Watson causing the reporting of false and inflated AWPs.

¶11. In sum, the chancery court concluded that Watson violated Mississippi Code Section 75-24-19(1)(b) of the Mississippi Consumer Protection Act 5, 241 times based on the number of times Watson published an inflated average wholesale price for a drug Medicaid reimbursed. As a consequence, the chancery court ordered Watson to pay civil penalties in the amount of $1,000 per violation for a total of $5,241,000. The chancery court declined to award the State's requested injunction because the State failed to offer any evidence about Watson's current practices or Medicaid's current reimbursement method. The chancery court also awarded the State $7,141,552 in compensatory damages for the common-law-fraud violation. The damages amount was based on the State's expert witness's testimony regarding how much Mississippi Medicaid overpaid for reimbursements. Lastly, the chancery court postponed a punitive judgment award pending another hearing.

¶12. On February 28, 2014, the chancery court heard argument regarding whether the State was entitled to punitive damages and post-judgment interest. In its opinion letter, the

10

chancery court noted that "[t]his is clearly not a 'run of the mill' fraud case but rather a planned, calculated, bold and fraudulent effort to, in a highly improper and unfair manner, maximize the company's profits and to do so on the backs of the taxpayers who are ultimately footing the bill for Watson's 'free run of the candy store' of the public trust and money." The chancery court further elaborated that "[t]his case is the 'textbook' case where punitive damages are not only appropriate but highly needed." Further, the chancery court explained that the award of punitive damages is "reasonably and rationally related to the purpose to punish what occurred giving rise to the award and to deter its repetition . . . ." The chancery court then stated that Watson's conduct was "clearly reprehensible[,]" "continued for a long period of time," and that Watson was aware of its actions and attempted to conceal them. Finally the chancery court ordered that Watson Pharmaceuticals, Inc.,[2] pay $17,879,500 in punitive damages. Watson Pharma was deemed to have a negative net worth, so it was not ordered to pay any punitive damages. The chancery court awarded three percent of post-judgment interest on the compensatory and punitive-damages amounts.

¶13. The chancery court entered its final judgment on May 16, 2014. Following Watson's post-trial motion, the chancery court made some small changes to its findings, but otherwise denied Watson's motion on July 25, 2014. Watson appealed and the State filed a cross-appeal.

---

[2] The chancery court's letter opinion ordered the punitive damages against Watson Pharmaceuticals, Inc., but the chancery court's prior findings of fact and conclusions of law dismissed Actavis f/k/a Watson Pharmaceuticals, Inc., as a defendant. In the final judgment, the correct party, Watson Laboratories, was ordered to pay the punitive-damages award.

## STATEMENT OF THE ISSUES

¶14.    On appeal, Watson asks the Court to vacate the judgment and render judgment for all claims in Watson's favor.  Specifically, Watson raises the following issues, presented verbatim, with any emphasis appearing in the original:

I.      Whether the Chancellor erred as a matter of law when he substituted "equity" for law in determining that Watson made false statements when it attached the label "Average Wholesale Price" to pricing information that the Chancellor found was known by industry participants, including Mississippi Medicaid, to represent reimbursement benchmarks known to be higher than averages of actual market prices.

II.     Whether the Chancellor erred as a matter of law in finding Watson liable for fraud despite having determined that the State failed to prove an essential element of its claim, to wit, "the hearer's ignorance of [the representation's] falsity," based on his conclusion that "DOM[3] understood that Watson's AWPs . . . were not true average (sic) of wholesale prices charged by Watson to retailers for its particular drug products."

III.    Whether the Chancellor erred as a matter of law when he found that DOM reasonably relied on *its (alleged) belief* that Watson's "AWPs" were "reasonably close" or "predictably related" to averages of actual market price, despite that Watson never made any such statements and despite that the Chancellor found that Watson's alleged "false statement" was a different statement, i.e., Watson's alleged representation that "AWPs" are equal to averages of actual market prices.

IV.     Whether the Chancellor erred as a matter of law and fact when he concluded that despite his finding that Watson's conduct was consistent with industry custom and practice, the State had nevertheless proven by clear and convincing evidence that Watson intended to defraud

_____

[3]DOM refers to Mississippi's Division of Medicaid.  In this opinion, Mississippi's Division of Medicaid is referred to as Mississippi Medicaid.

12

Mississippi Medicaid when it engaged in that conduct.

V.  Whether the Chancellor erred as a matter of law and fact in finding that Watson's conduct caused the State to pay more for drugs than it otherwise would have based upon the speculative assertion that had DOM known the average prices paid for Watson's drugs it would have reimbursed pharmacies exactly at such average, when the undisputed evidence established that DOM's reimbursement rates were the result of complicated political compromise necessary to protect Medicaid beneficiaries' access to care.

VI.  Whether the Chancellor erred as a matter of law and fact by finding that Watson violated the Mississippi Consumer Protection Act ("MCPA") by (a) ignoring that Watson's "AWPs" were not "unfair" or "deceptive" for the same reasons they were not fraudulent, and (b) relying on legal standards that were modified decades ago.

VII.  Whether the Chancellor erred as a matter of law and fact by finding that Watson Lab's conduct merited punitive damages (a) based on evidence relating to the conduct of Schein, Inc. (later known as Watson Pharma) before Schein, Inc. was acquired by WPI, and thus evidence that was not relevant and should not have been considered in considering whether Watson Labs'[s] conduct warranted punitive damages; (b) despite the Chancellor's finding that Watson Labs ['s] conduct comported with industry custom and practice, evidence that established that Watson Labs's conduct was not extreme or otherwise outside of industry norms; and (c) despite failing to account for DOM's own conduct which militated against awarding punitive damages.

¶15.  For organizational purposes and clarity, the Court combines the issues raised into issues involving the common-law-fraud finding, the Mississippi Consumer Protection Act finding, and the punitive-damages award.  The State's cross-appeal raises the following issue:

1. The trial court ordered Watson to pay $7,141,552 in compensatory damages due to Watson fraud.  The trial court also found that Watson violated the Mississippi Consumer Protection Act but did not alternatively award the

13

$7,141552 under the MCPA because it had ruled that the State was procedurally barred from recovering damages under the MCPA. Should the trial court have allowed the State to collect compensatory damages under the MCPA?

## STANDARD OF REVIEW

¶16. The Court leaves the chancery court's factual findings intact if the findings are supported by substantial evidence and are not determined to be an abuse of discretion, manifestly wrong, or based upon the application of an erroneous legal standard. *In re Estate of Baumgardner*, 82 So. 3d 592, 598 (Miss. 2012). The Court reviews questions of law using the de novo standard. *Id.*

¶17. Watson argues that the Court should apply a heightened standard of review because the chancery court's final judgment is largely verbatim from the State's proposed final judgment. In *Burnham v. Burnham*, 185 So. 3d 358, 360 (Miss. 2015), the Court stated that "the rule that a chancellor's decision to adopt a party's proposed findings of fact was subject to 'heightened scrutiny'" was abandoned by the Court in *Bluewater Logistics, LLC v. Williford*, 55 So. 3d 148, 156–7 (Miss. 2011). Watson attempts to distinguish *Burnham* by explaining that *Brooks v. Brooks*, 652 So. 2d 1113, 1118 (Miss. 1995), has not been overruled and that, although the *Bluewater Logistics* opinion did abolish the heightened-scrutiny standard, "it did so without analyzing the reasons for the holding." *See Bluewater Logistics*, 55 So. 3d at 156–7. While Watson is correct that *Brooks* has not been overruled in its entirety, we take this opportunity to reaffirm this Court's recognition in *Burham* that "we [have] abandoned the rule that a chancellor's decision to adopt a party's proposed

findings of fact was subject to 'heightened scrutiny.'" ***Burnham***, 185 So. 3d at 360.

¶18. Finally, Watson alludes on several occasions to the State changing its argument or deviating from its pleadings in this appeal. This court's obligation is to assure that the trial court properly applied the correct legal standard to the evidence properly presented at trial and that its ultimate conclusion did not constitute an abuse of discretion. Any objection, to the extent there is one, has been waived by a failure to object at trial or raise the issue in post-trial motions. When evidence is introduced or an issue is raised with the express or implied consent of the other party, the pleadings shall be treated in all respects as if they had been amended to conform to such evidence. M.R.C.P. 15(b). This is particularly true when the issue has been tried. That is the case here.

**ANALYSIS**

### I. Fraud

¶19. As relates to common-law fraud, Watson basically argues that the State has proven none of the requisite elements. Specifically, Watson argues that it made no false statement, that the State knew of any alleged falsity, that the State did not rely on the alleged false statement, that Watson had no intent to deceive, and the State suffered no injury. The chancellor found otherwise, and we agree.

¶20. In Mississippi, "the circumstances constituting fraud or mistake shall be stated with particularity." M.R.C.P. 9(b). The elements of an intentional or fraudulent representation are:

> (1) a representation, (2) its falsity, (3) its materiality, (4) the speaker's

15

knowledge of its falsity or ignorance of its truth, (5) his intent that it should be acted on by the hearer and in the manner reasonably contemplated, (6) the hearer's ignorance of its falsity, (7) his reliance on its truth, (8) his right to rely thereon, and (9) his consequent and proximate injury.

*Trim v. Trim*, 33 So. 3d 471, 478 (Miss. 2010) (quoting *McCord v. Healthcare Recoveries, Inc.*, 960 So. 2d 399, 406 (Miss. 2007)). Further, "[f]raud must be proved by clear and convincing evidence." *Sapukotana v. Sapukotana*, 179 So. 3d 1105, 1114 (Miss. 2015) (citing *Nichols v. Sauls' Estate*, 165 So. 2d 352, 356 (Miss. 1964)). Fraud is essentially a question best left to the factfinder. *Allen v. Mac Tools, Inc.,* 671 So. 2d 636, 643 (Miss. 1996).

### 1. Watson's False Representation

¶21. Watson's argument that it did not make a false statement appears to be twofold. First, Watson argues that it did not make a false statement because everyone in the industry knew that "Average Wholesale Price" did not mean "average wholesale price" and, therefore, the statement is true. Secondly, Watson argues that Mississippi Medicaid knew that "Average Wholesale Price" did not mean "average wholesale price" and, therefore, cannot recover. This second argument is addressed hereinafter as it relates to the hearer's ignorance of its falsity and reliance on its truth and has no bearing on whether the statement was actually false or not.

¶22. Watson's argument, therefore, is that it was common knowledge in the industry that AWP is a term of the trade that does not actually mean the "average wholesale price" of a

16

particular drug.[4] Watson maintains that AWP is more akin to a "suggested" wholesale price and, in the context of this case, is really used in the pharmaceutical drug field only as a means to obtain a generic designation for the particular drug at issue. The chancellor found, in part, that the parties understood "that Watson's [average wholesale prices] published in [First DataBank] that were relied on by [Mississippi Medicaid] in determining its estimated acquisition cost reimbursement for Watson's drug[s] were not true average[s] of wholesale prices charged by Watson to retailers for its particular drug products."

¶23. Watson would have the analysis end there. However, as stated above, Mississippi Medicaid's knowledge of the falsity (a falsity Watson does not acknowledge exists) is not germane to the question of whether or not the representation was actually false. Therefore, Watson's sole argument to support its position that there was no false statement is that "AWP" is an industry term and, because the industry did not define the term "Average Wholesale Price" as a layman would define the term "average wholesale price," it was not false.

¶24. The problem with Watson's argument is that it was well aware that Mississippi Medicaid relied upon the numbers in First DataBank and/or similar publications to establish a benchmark or starting point in determining estimated acquisition costs. Watson knew that

---

[4] All parties acknowledge that AWP did not have a layman's meaning of "average wholesale price." It should be noted, however, that the evidence on this issue was conflicting. At times, First DataBank defined it as an "average . . . charged." Certain industry participants, including Schein, defined it at one point as "composite wholesale price charged." Nevertheless, Mississippi Medicaid agreed that AWP was not a true average.

17

First DataBank defined the term "Average Wholesale Price" as "either the published suggested wholesale price obtained from the manufacturer or the price commonly charged by wholesalers as determined by survey." The numbers submitted by Watson to First DataBank were neither. They were numbers driven by the requirements necessary to obtain a generic drug designation. They were *not* "suggested wholesale prices" or "list prices."[5] They were fabricated numbers tied to nothing more than a ceiling amount it was necessary to stay under in order to obtain a generic designation.

¶25.    As the numbers were not what they were purported to be in the publication to which Watson submitted them, they are false.[6] Further, Watson knew First DataBank's definition of AWP and continued to update its numbers with the publication. Thus, Watson did make a false representation.

---

[5]Testimony made it clear that AWP meant nothing, as relates to pricing, in the industry. Napolean Clark, the Director of Marketing for Watson's Generic Division, testified, in part, that, "The contract prices that we negotiate with the customers are a confidential negotiated price, and the SWP *plays no bearing* in those discussions and those negotiations." (Emphasis added.) AWP and SWP were synonymous although evidence presented through the Price Alert Bulletin indicates that was not always the case.

[6]Throughout its brief, Watson makes much of the chancellor's referenceto"equity" in defining the term AWP. We do not agree with Watson's contention that the chancellor referenced equity in an attempt to circumvent the proper legal conclusion. Upon review of the judgment, it is clear that the chancellor referenced his equitable powers only as a reinforcement of his decision to reject Watson's definition of AWP. While the chancellor's reference to equity may have been a poor choice of words, we do find that the chancellor used the correct legal standard to determine the meaning of AWP. The chancellor properly laid out the evidence and rejected Watson's position as to the meaning of AWP.

### 2. *Watson's Intent to Deceive*

¶26.    Sufficient evidence exists in the record to support the chancellor's finding of an intent to deceive.  This evidence included, but was not limited to, proof that Watson and others in the industry "marketed the spread."  Watson denies that it "marketed the spread" despite a plethora of evidence that demonstrated that the practice was the industry standard.  Cindy Boydston, a former salesperson and national sales trainer for Schein Pharmaceuticals—Watson's predecessor– testified that, "The generic industry is built upon the spread."  Letters introduced into the record also confirmed that AWP was a "tactic" and that Schein was "willing to make any adjustments in AWP that are necessary to make our customers more competitive in the area of reimbursement" and that, if the spreads were not favorable, Schein would "find out where our AWP needs to be to become favorable."  Other letters also were introduced that demonstrated that Watson marketed products "via lucrative spreads."  The greater the spread, the greater the profit.  Watson also published its AWP with knowledge that Mississippi Medicaid would see and use it in its reimbursement calculations. The evidence clearly established that a bigger "spread" meant more business for Watson. The trial court was allowed to rely upon the totality of the evidence in making this determination.

¶27.    Intent is rarely susceptible to direct proof.  ***Price v. State***, 749 So. 2d 1188, 1194 (Miss. Ct. App. 1999) ("Intent is almost always, absent a confession, proved by inferences from conduct and not by direct evidence."); ***Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,*** 120 F.3d 1253, 1256 (Fed. Cir. 1989) ("Direct evidence of intent or proof of

19

deliberate scheming is rarely available in instances of inequitable conduct, but intent may be inferred from the surrounding circumstances."). This is especially applicable in a fraud setting. Watson, as may have been its right, certainly chose not to advise Mississippi Medicaid that its "starting point" was based on an illusion.

¶28. As the old idiom goes, "'actions generally speak even louder than words.'" *Farragut v. Massey,* 612 So. 2d 325, 329 (Miss. 1992) (quoting *Sumter Lumber Co. v. Skipper*, 184 So. 296, 299 (Miss. 1938)); *Corely v. Reed,* 145 So. 241, 243 (Miss. 1933). Watson knew that Mississippi Medicaid would rely on its false statements and benefitted from this reliance. It is evident that Watson intended to deceive Mississippi Medicaid.

### 3. Mississippi Medicaid's Ignorance of the Falsity and Reasonable Reliance on its Truth

¶29. Watson's strongest arguments certainly are that Mississippi Medicaid had knowledge of the falsity and did not reasonably rely on the truth of the statement. Watson's position in this regard is best summarized by the State's brief in which it notes, "Of course Mississippi Medicaid did not think Watson's [average wholesale prices] were the actual averages . . . ." The trial judge confirmed as much, finding that Mississippi Medicaid did, in fact, know that the meaning of AWP did not correlate to true averages of wholesale prices charged to retailers.

¶30. Watson thus would have us hold that Mississippi Medicaid knew of the falsity and, likewise, had no right to rely on an alleged false statement if Mississippi Medicaid knew it to be false. Also, Watson bolsters this argument by pointing out that the Office of the

20

Inspector General ("OIG") and others had warned Mississippi Medicaid on numerous occasions that AWP numbers did not represent actual averages and that the actual prices were much lower. While this is a facially appealing argument, reality is never quite so simple.

¶31. Watson's argument misses the point. We agree that Mississippi Medicaid knew that AWP did not represent the actual averages that were paid for the drugs in question and that the OIG and others sent several letters warning Mississippi Medicaid that AWP was unreliable because the actual prices paid were much lower. Testimony at trial and other evidence, including the OIG letters, though, clearly established that the actual prices paid were the result of a vast array of discounts that were given to the purchasers. Indeed, the letters from the OIG recognized as much and listed AWP minus an appropriate discount as being one of three proper ways to deal with this discrepancy, and Mississippi Medicaid` reasonably chose this method to deal with the discrepancy.

¶32. Today, we refuse to improperly limit the scope of Watson's fraudulent representation. Watson would have us hold that, because Mississippi Medicaid knew that AWP did not represent the actual "average wholesale price," as that term is commonly used, Mississippi Medicaid knew that AWP was a false statement and cannot reasonably have relied on Watson's statement. This argument, though, accounts for only one facet of the fraudulent representation made by Watson. While we agree, and the State concedes, that Mississippi Medicaid knew what AWP was not, it had no idea what it was—a fabricated number used

to situate the drug manufacturer in the generic market place.[7] Mississippi Medicaid did not know that AWP was *not* a "suggested wholesale price" upon which discounts were then applied. Yet "suggested wholesale price" is the definition of AWP used by First DataBank. Watson knew that the numbers would be presented as such when it forwarded them to be published. That is the fraud.

¶33. Mississippi Medicaid had every right to rely on AWP as a "starting point" or "benchmark" for determining appropriate reimbursement rates. They were held out as a "suggested wholesale price" and constituted the number upon which Mississippi Medicaid attempted to determine an appropriate discount. Proof of supposed warnings are just red herrings in the analysis. The OIG letters specifically provided that a proper reduction of AWP was an acceptable alternative.[8] That is exactly what Mississippi Medicaid attempted to do. When given national survey numbers, Mississippi Medicaid attempted to determine

---

[7]Mississippi Medicaid knew that AWP was not an accurate representation of the actual price of the drug, but it is evident from the record that Mississippi Medicaid did not know that AWP had no rational relationship to the undiscounted price of the drug. The Price Alert Bulletin stated that AWP was not an accurate figure because of discounts, premiums, rebates, special offers, incentives, etc., and likened it to a "sticker price" in the auto industry. Clark's testimony on behalf of Watson, though, clearly contradicts this. Watson attempted to liken the prices to the sticker price (Manufacturer's Suggested Retail Price ("MSRP")) for an automobile during witness examination at trial. However, the analogy supports the State. The MSRP on an automobile is a price one can walk into the dealership and, very unwisely, pay. However, as everyone knows, a multitude of discounts and reductions *are applied* to the MSRP to reach a final price. One does not simply get a $30,000 automobile for $5,000. The MSRP has meaning related to the final price. It is clear from the record that the AWP did not.

[8]Notices from CMS only condemned "nondiscounted" or "unmodified" AWPs.

22

the amounts actually being paid in Mississippi based upon Mississippi's particular facts and circumstances and with full knowledge that if the reimbursements were discounted too much, Mississippi Medicaid would run afoul of federal laws aimed at keeping the marketplace accessible.

¶34.    Mississippi Medicaid's reimbursement plan, as the State argued, was governed by federal law.  Title 42 Section 1396a(a)(30) required, in part:

> A State plan for medical assistance must . . . assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area.

42 U.S.C. § 1396a(a)(30).  Further, Mississippi Medicaid's reimbursement formula had to be approved by a federal agency.  This agency, the Center for Medicare and Medicaid Services ("CMMS"), was well aware of the issues surrounding AWP, as evidenced by the OIG letters.  Yet CMMS continued to approve Mississippi's reimbursement plan.  Once again, Mississippi Medicaid had a right to believe its reimbursement formula was sound.

¶35.    Finally, as noted above, Mississippi Medicaid did not simply bury its head in the sand. Upon receiving warnings, it attempted to determine the prices that were actually being paid in Mississippi.  Efforts were made to establish an appropriate discount to the AWP figure.[9]

---

[9]These included well-reasoned attempts to set an appropriate AWP discount through communication with the Regional Division of Medicaid and contact with the Medicaid divisions of other states.  Mississippi Medicaid also commissioned a study which included findings from a consultant that a recommended option for reimbursement was AWP minus a discount.

It must be noted that the efforts of Mississippi Medicaid were subpar. Whether through bad decisions, lack of manpower or other reasons, the efforts fell short. That is, of course, the problem with dealing with fraud. One does not know the actions are fraudulent until it is too late.

¶36. Mississippi Medicaid was under no obligation to investigate facts it reasonably had a good-faith basis to rely upon. "Contributory negligence is not a defense to an action based on fraud." *Nash Mississippi Valley Motor Co. v. Childress*, 125 So. 708, 709 (Miss. 1930). The hearer is entitled to reasonably rely on a facially valid statement. *See id*. ("If a false statement is made by one who may be fairly assumed to know what he is talking about, it may be accepted as true, without question and without inquiry, although the means of correct information are in reach."). Mississippi Medicaid had a good-faith basis to believe AWP constituted a proper starting point for determining reimbursement rates and took steps—whether adequate or not—to discount that amount. As the chancellor recognized, though, such efforts were futile as Mississippi Medicaid's "starting point" meant nothing.

¶37. Regarding Mississippi Medicaid's reasonable reliance, the law is best summarized in *Rhyne v. Gammil*, in which the Court held:

> It is enough that it be made with an inexcusable disregard of its accuracy, and where all of the facts are in the possession of the person making the representation, he may not shift the burden of verification upon one who he knows is acting upon his representation.

*Rhyne v. Gammil*, 60 So. 2d 500, 502 (Miss. 1952); *see also* Weems, R., *Mississippi Law of Torts*, § 10.1 (2d ed. 2008).

24

### 4. *Mississippi Medicaid's Injury*

¶38.    "[D]amages are speculative only when the cause is uncertain, not when the amount is uncertain." *Parker Tractor & Implement Co. v. Johnson*, 819 So. 2d 1234, 1239 (Miss. 2002) (citing *Adams v. U.S. Homecrafters, Inc.*, 744 So. 2d 736, 740 (Miss. 1999)). "'Where it is reasonably certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery. . . .'" *Warren v. Derivaux*, 996 So. 2d 729, 737 (Miss. 2008) (quoting *Cain v. Mid-South Pump Co.*, 458 So. 2d 1048, 1050 (Miss. 1984)).

¶39.    Evidence in the record is sufficient to show the overpayment for the drugs in question. The extent of the damages, through just and reasonable inference, has been supported by the evidence.  Mississippi law is clear that an award for damages where the sum is uncertain will not fail.  Such an award is sufficient under the law.

¶40.    Watson also argues that damages have not been shown because the State made no significant changes to its reimbursement formula and that its formula was based on "reasons independent of any belief that Watson's [average wholesale prices] were equal to or 'predictably related' to actual averages of transaction prices."   According to Watson, Mississippi Medicaid's "reimbursement levels were the result of political pressure and the compromises made by [Mississippi Medicaid] to ensure access to care for all of its beneficiaries."  Watson, once again, misses the point.

¶41.    Mississippi Medicaid made multiple changes to its reimbursement formula and the fact that it may have taken into account additional factors, political or otherwise, is not

25

relevant to whether the injury actually existed, given the evidence in the record. We agree with Watson that the fraudulent misrepresentation must have proximately caused Mississippi Medicaid's injury. *See Russell v. S. Nat'l Foods, Inc.*, 754 So. 2d 1246, 1256 (Miss. 2000) ("[R]ecovery is not permitted if the proximate cause of the monetary loss is other than the fraud alleged."). We disagree with Watson's argument, though, that the fraud did not proximately cause the injury. Substantial evidence in the record supports this finding by the chancellor. Further, insufficient evidence exists in the record to support Watson's argument that the other reimbursement factors, supposedly considered by Mississippi Medicaid, would have caused the injury had Watson not defrauded Mississippi Medicaid. Given the record before us, Watson's argument, if relevant at all, would go to the amount of damages—whether Mississippi Medicaid properly mitigated its damages as a result of the injury—and not to whether the injury exists. *See State v. Abbott Laboratories*, 829 N.W.2d 753, 763–64 (Wisc. App. 2013).

¶42.    In sum, we find substantial evidence to support the chancellor's finding that Watson defrauded the State. For years, Watson intentionally published its AWPs to Mississippi Medicaid with the knowledge and intent that Mississippi Medicaid would rely on the figures for its reimbursement formulas. While Mississippi Medicaid knew that Watson's AWPs were not the actual wholesale prices of the drug, it is evident that Mississippi Medicaid did not know that the AWPs had no relation to the actual prices paid for the drugs. As such, Mississippi Medicaid continued to reasonably rely on the AWPs as the starting point for its

reimbursement formula. All the while, Watson "marketed the spread," exploiting Mississippi Medicaid's lack of knowledge at the expense of the taxpayers of the State of Mississippi.

## II. Mississippi Consumer Protection Act

### A. Watson's Violation of the Mississippi Consumer Protection Act

¶43. The chancery court determined that Watson had violated the Mississippi Consumer Protection Act. The Mississippi Consumer Protection Act prohibits "unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Miss. Code Ann. § 75-24-5(1) (Rev. 2016). Section 75-24-5(2) provides that the following are "unfair methods of competition and unfair or deceptive trade practices or acts" and are prohibited: "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" and "[m]isrepresentations of fact concerning the reasons for, existence of, or amount of price reductions." Miss. Code Ann. § 75-24-5(2)(e),(k).

¶44. Here, it is unnecessary to regurgitate the facts at issue, as they are identical to those addressed in the common-law fraud analysis above. However, it is worthy to note that fraud is not required to establish a violation of the Mississippi Consumer Protection Act. *See Holman v. Howard Wilson Chrysler Jeep, Inc.,* 972 So. 2d 564, 572 (Miss. 2008). This makes a claim easier to prove, at least as relates to its deceptive nature, under the Mississippi Consumer Protection Act. Relating to the consumer-protection claim, the chancellor found

27

that:

> Watson's conduct in causing to be published AWPs that have no predictable relationship to what consumers pay for its drugs while knowing Mississippi relied on this information in determining [estimated acquisition cost] is an unfair and deceptive trade practice within the meaning of Mississippi's Consumer Protection Act.

We concur.

¶45.    Watson argues that the chancellor erred by applying the "capacity or tendency to deceive" test, as it is outdated and has been replaced by the target-audience test adopted by the Federal Trade Commission. *See Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319 (1984).

¶46.    This argument is without merit.  Section 75-24-3(c) provides, in part:

> that in construing what constitutes unfair or deceptive trade practices that the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USCS 45(a)(1)) as from time to time amended.

Simply stated, the chancellor adhered to the act.

¶47.    The chancellor explained that Mississippi's Consumer Protection Act does not provide a definition of what is an "unfair or deceptive trade practice[;]" therefore, the chancellor used guidance from the Federal Trade Commission and federal-court precedent of analogous federal statutes.  The chancellor relied on *FTC v. Raladam Co.*, 316 U.S. 149, 152, 62 S. Ct.  966, 86 L. Ed. 1336 (1942), in which the United States Supreme Court determined that a particular act or practice is deceptive or unfair if it has the capacity or tendency to deceive. The chancellor also cited *In Re: Giant Food, Inc.*, 61 F.T.C. 326 (1962) to explain that

28

"FTC regulations regarding advertisements for reductions off list prices maintain that a particular list price 'will not be deemed fictitious if it is the price at which substantial (that is not isolated or insignificant) sales are made' but that one 'significantly in excess of the highest price at which substantial sales in the trade area are made' is misleading." Finally, the chancellor cited *In Re: Lupron*, 295 F. Supp. 2d 148, 168 n.19 (D. Mass. 2003), in which the district court stated: "There is a difference between a sticker price and a sucker price. If one were confronting a modest mark up of the actual [average wholesale price] . . . intended to make sales of the drug for the treatment of Medicare patients commercially viable . . . , it is unlikely that there would have been a government investigation of Defendants' marketing practices."

¶48. Decisions of the federal courts and the Federal Trade Commission clearly "guided" the chancellor's determination. Nothing in Section 75-24-3(c), though, delegates the chancellor's determination to the federal courts, nor does the statute bind Mississippi judges to varied, changing decisions at the federal level. The judges, as factfinders in bench trials, and the juries of the State of Mississippi are perfectly capable of determining—while being "guided" by federal authority—what are deceptive practices. That is exactly what the chancellor did here.

¶49. Further, the debate over the correct standard in the case at hand is not relevant in that Watson's actions were deceptive under either standard. Watson's practice in publishing its AWPs has been discussed in depth above in the common-law-fraud analysis. The practice

29

clearly is misleading.

¶50.    In addition, numerous state courts, addressing substantially similar consumer protection, have found the practice to be deceptive or misleading even in cases where the judgment against the pharmaceutical company was reversed. *In the Matter of Mississippi Medicaid Pharmaceutical Average Wholesale Price Litigation: Sandoz, Inc. v. State of Mississippi,* 190 So. 3d 829, 841 (Miss. 2015) ("[U]nfair reporting of fictitious AWPs caused the substantial injury of $23,661,618 in overpayments to pharmacies participating in Medicaid.") (affirming judgment); *Abbott Laboratories*, 829 N.W.2d at 761–62 (affirming judgment); *Sandoz, Inc. v. Com. ex rel Conway*, 405 S.W.3d 506 (Ky. 2012) ("We recognize, however, that there was ample evidence from which the jury could have properly determined that Sandoz did, in fact, submit AWPs in a false, misleading, or deceptive manner.") (reversing judgment); *Blue Cross Blue Shield of Massachusetts, et al v. AstraZeneca Pharms, LP,* 582 F.3d 156 (1st Cir. 2009) (affirming judgment).

¶51.    Second, a consumer not only could but did rely upon the misleading practice while acting reasonably under the circumstances.  Like a number of states, Mississippi Medicaid used AWP as a starting point for determining its reimbursement rate.  It was reasonable to believe that a price advertised as a "suggested wholesale price" would have a correlation to the actual, wholesale price or at least to some price.[10]  Mississippi Medicaid knew that there

---

[10]Evidence noted that the Federal Register had addressed the purposeful manipulation of the AWP to increase customer profits from federal health care programs in its publication.

would be discounts from this price and it attempted, subject to numerous constraints, to adjust AWP to those discounts. Finally, for reasons already addressed, the practice was material.

### B. Compensatory Damages Pursuant to the Mississippi Consumer Protection Act

¶52. We now turn to the State's cross-appeal. The State asserts that the chancery court erred in finding that it was not permitted to receive compensatory damages for violations of the Mississippi Consumer Protection Act because the State had failed to comply with an informal dispute resolution program as required by Mississippi Code Section 75-24-15(2). First, the State claims that Watson waived its right to raise the State's noncompliance with Section 75-24-15(2) since it waited nearly seven years to raise it. Further, the State contends that it is not subject to the dispute-resolution requirement because it is not a private action as discussed by the statute. Finally, the State urges that, even if it did not comply with Section 75-24-15(2), the chancery court could have relied on Mississippi Code Section 75-24-11 to provide compensatory damages to the State. The State is not entitled to compensatory damages for a violation of the Mississippi Consumer Protection Act.

### 1. Waiver

¶53. For several reasons, Watson did not waive its right to file for dismissal based on the State's failure to attempt resolution through the informal dispute-settlement program. It is undisputed that the State never pleaded or referred to Section 75-24-15 in its case, but Watson claims that the reason it filed its motion to dismiss was based on the chancery court's

31

recent award of compensatory damages under Section 75-24-15 against Sandoz, even though the State had not raised Section 75-24-15 in its complaints against Sandoz either. Thus, once Watson learned of the Sandoz verdict in late 2011, which awarded compensatory damages pursuant to Section 75-24-15 even though not pleaded, it promptly filed the motion to dismiss. Such action was reasonable.

¶54. Additionally, Watson counters the State's waiver argument by arguing that the informal dispute settlement program was a statutory requirement that could not be waived. The Court has not addressed the issue, but in 2007, the Court of Appeals did address the exact issue. In *Dominquez v. Palmer*, 970 So. 2d 737, 743 (Miss. Ct. App. 2007), the Court of Appeals rejected a party's claim that the other party had waived his right to raise noncompliance with Section 75-15-24(2) due to active participation in the litigation. The Court of Appeals explained that Section 75-15-24(2) was a "statutory requirement with which a plaintiff must comply" and not similar to a party's failure to compel arbitration early in litigation. *Id.*

¶55. Watson did not waive its right to raise noncompliance with Section 75-24-15(2) in its motion to dismiss.

### 2. *Applicability of Section 75-24-15(2)*

¶56. Section 75-24-15 is titled "Private Actions." According to subsection one, "any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property . . . as a result . .

. . may bring an action at law . . . to recover such loss of money or damages for the loss of such property . . . ." Miss. Code Ann. § 75-24-15(1) (Rev. 2016). Section 75-24-15(2) provides: "In any private action brought under this chapter, the plaintiff must have first made a reasonable attempt to resolve any claim through an informal dispute settlement program approved by the Attorney General." (Emphasis added.) Next, Section 75-24-15(3) provides: "In any action . . . under this section of this chapter, a prevailing defendant may recover in addition to any other relief that may be provided in this section costs and a reasonable attorney's fee, if in the opinion of the court, said action . . . was frivolous or filed for the purpose of harassment or delay." Finally, subsection four states that "[n]othing in this chapter shall be construed to permit any class action or suit, but every private action must be maintained in the name of and for the sole use and benefit of the individual person." Miss. Code Ann. § 75-24-15(4) (Rev. 2016).

¶57. According to the State, "[s]ubsection [one] establishes the right of an individual that was cheated to bring an action under the [Mississippi Consumer Protection Act]. That is exactly what the State did. This right is not limited to 'private actions'– just limited to persons that suffered an ascertainable loss." The State asserts that the phrase "private action" "is not mentioned until [s]ubsection [two]." The State elaborates that "private action" also is not included in subsection three but does appear in subsection four. The State's argument is that it was permitted to bring its action under subsection one, but any of the subsections that contain the phrase "private action" do not apply because the action is a public action

33

brought by the Attorney General.

¶58. The State fails to explain how, in a section titled "Private Actions," it could bring a public action, which is not authorized or contemplated under subsection one, and receive the benefit of the section without also complying with the remaining provisions. It is not a logical reading of the statute. The chancellor was correct.

3. *Section 75-24-11*

¶59. The State next argues that, even if it is not eligible for compensatory damages under Section 75-24-15, the chancery court should have awarded damages pursuant to Section 75-24-11, which provides that "the court may make such additional orders or judgments, including restitution, as may be necessary to restore to any person . . . any monies or property, real or personal, which may have been acquired by means of any practice prohibited by this chapter . . . ." Miss. Code Ann. § 75-24-11 (Rev. 2016). The State claims that the chancery court should have awarded it $7,141,552, the same amount it received as compensatory damages for the fraud claim.

¶60. The State has not provided a single citation to the more than 50,000-page record where the chancery court addressed the applicability of Section 75-24-11, and it was mentioned only in passing during the proceedings. Without the benefit of a citation to the record, which is the duty of the State to provide pursuant to our appellate rules, showing the issue was presented to the chancery court and rejected, the issue cannot adequately be addressed. *See* M.R.A.P. 28(a)(7), (f). The Court does not hold lower courts in error for

34

issues not presented to it and ruled upon by the lower court. "We accept without hesitation the ordinarily sound principle that this Court sits to review actions of trial courts and that we should undertake consideration of no matter which has not first been presented to and decided by the trial court." *Educ. Placement Servs. v. Wilson*, 487 So. 2d 1316, 1320 (Miss. 1986). We decline to hold the Chancellor in error on this issue.

### III. Punitive Damages

¶61. In Mississippi, an award of punitive damages is governed by statute. Mississippi Code Section 11-1-65(1)(a) provides that

> punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud.

Miss. Code Ann. § 11-1-65(1)(a) (Rev. 2014). Additionally, Section 11-1-65(1)(e) outlines factors for a factfinder to consider, when relevant, in cases involving punitive damages:

> the defendant's financial condition and net worth; the nature and reprehensibility of the defendant's wrongdoing, for example, the impact of the defendant's conduct on the plaintiff, or the relationship of the defendant to the plaintiff; the defendant's awareness of the amount of harm being caused and the defendant's motivation in causing such harm; the duration of the defendant's misconduct and whether the defendant attempted to conceal such misconduct; and any other circumstances shown by the evidence that bear on determining a proper amount of punitive damages.

Miss. Code Ann. § 11-1-65(1)(e) (Rev. 2014). "Punitive damages are permissible for wrongs that 'import insult, fraud or oppression and not merely injuries but injuries inflicted in the spirit of wanton disregard for the rights of others.'" *Wise v. Valley Bank*, 861 So. 2d 1029,

35

1033 (Miss. 2003) (quoting *First Nat'l Bank v. Langley*, 314 So. 2d 324, 339 (Miss. 1975)).

¶62.    The chancery court noted that it had considered the factors set forth in Section 11-1-65 in making its award.  The chancery court stated that the award was "reasonably and rationally related to the purpose to punish what occurred giving rise to the award and to deter its repetition" and that the "evidence clearly supports an ongoing need to deter Watson and others from engaging in fraudulent profit taking at the cost of the public trust, the public funds, the program itself and the beneficiaries of the program, who . . . are already at a disadvantage in their respective life circumstances."  The chancery court further explained that Watson's conduct was clearly reprehensible and had continued for a long period of time, and that Watson clearly was aware of the misconduct and had attempted to conceal its actions.

¶63.    The chancery court applied the applicable law to the evidence.  Watson does argue that the court based its decision largely on inadmissible and/or irrelevant documents of corporations independent of Watson.  However, the record does not support the argument that the decision was based largely on these documents.  Further, the documents were relevant to issues before the court including, but not limited to, "marketing the spread" by Watson and others in the pharmaceutical industry.  This argument is without merit. The punitive damages award is affirmed.

## CONCLUSION

¶64. For the reasons stated above, the judgment of the chancellor is affirmed on both direct appeal and cross-appeal.

¶65. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED.**

**RANDOLPH AND KITCHENS, P.JJ., KING, MAXWELL AND BEAM, JJ., CONCUR. COLEMAN, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY ISHEE, J. WALLER, C.J., NOT PARTICIPATING.**

**COLEMAN, JUSTICE, DISSENTING:**

¶66. The majority affirms the trial court's award and finding of fraud that is based on a fraudulent statement neither proven nor alleged but, rather, crafted for the first time by the trial court in its dispositive opinion. Moreover, the trial judge acknowledged in the opinion that, in order to impose liability against Watson, he disregarded the law applicable to fraud and rested his verdict on equitable considerations. The chancellor erred in doing so; equity must follow the law. The chancellor applied the wrong legal standard to the State's claims made pursuant to the Consumer Protection Act. Accordingly and with respect, I dissent.

## I. The State's common-law fraud claim failed as a matter of law.

¶67. The State's common-law fraud claim failed as a matter of law pursuant to the trial judge's own findings. The statement alleged and proved by the State to be false was known by the State to be false. Only by engineering a new, allegedly false statement and predicating the finding of liability upon it was the trial court able to find Watson liable, but the State neither alleged nor proved that Watson ever actually made the new, allegedly false statement.

37

*A.      The State bore the burden of proving all nine elements of common-law fraud by clear and convincing evidence.*

¶68.    In order to succeed on a claim of fraud, a party must prove by clear and convincing evidence each of the following nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted on by the person in a manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximate injury. ***Trim v. Trim***, 33 So. 3d 471, 478 (Miss. 2010).

*B.      The representation alleged and proven by the State to satisfy the first element of its fraud claim was the Average Wholesale Price of Watson's drugs.*

¶69.    The State recorded the final iteration of its claims against Watson in its Second Amended Complaint (as to Watson Pharmaceuticals . . . ). There, the State alleged that Watson had misrepresented the average wholesale price of its drugs. The State alleged that Watson misled "the State of Mississippi about the Average Wholesale Prices of [its] drugs. . . ," and that the Average Wholesale Price was not the "actual prices at which [Watson's] drugs were generally and currently available in the pharmaceutical marketplace. . . ." The State alleged that Watson engaged in "the typical generic drug industry practice of setting or publishing AWP with or without reference to the anticipated wholesale price of the product and then simply failing or declining to correct that price as the market drops." Under the section of the Second Amended Complaint detailing the fraud

allegations, the State alleged, "Watson and its related entities knew that the [Average Wholesale Price] information provided and caused to be reported was false."

¶70. Claims sounding in fraud must be pleaded with particularity. Miss. R. Civ. P. 9(b).

> "[T]he circumstances constituting the fraud shall be stated with particularity. Fraud will not be inferred or presumed and may not be charged in general terms. The circumstances of the alleged fraud such as the time, place *and contents of any false representations* or conduct must be stated." ***Brabham v. Brabham***, 483 So. 2d 341, 342 (Miss.1986) (citing Miss. R. Civ. P. 9(b); ***McMahon v. McMahon***, 247 Miss. 822, 157 So. 2d 494, 495 (1963); V. Griffith, Mississippi Chancery Practice § 589 (2d ed. 1950)).

***Allen v. Mac Tools, Inc.***, 671 So. 2d 636, 642 (Miss. 1996) (emphasis added). A plaintiff alleging fraud must include the allegedly false statement in the complaint. In the case *sub judice*, the statements alleged by the State to be false were the average wholesale prices of the various generic drugs it offered. Pursuant to the language of the complaint, discussed above, Watson told the State, through the reporting intermediary, that the average wholesale price of Drug A was $X. The statement was repeated and made over and over again as to each drug and each instance of reporting, and it was the statement alleged and proved by the State at trial in satisfaction of the first element of fraud.

¶71. After the trial, the chancellor wrote, "The State introduced substantial evidence in support of its position that [the Department of Medicaid] understood that the term [Average Wholesale Price] means just what it says: the *Average Wholesale Prices* paid to Watson by retailers for the drugs at issue." The chancellor listed the proof which included, *inter alia*, the plain meaning of Average Wholesale Price and various publications that define Average

39

Wholesale Price as an average of wholesale prices paid by retailers.

    C.    *The evidence showed, and the trial judge found, that the plaintiff State of Mississippi knew that the statement at issue was false, at which point the State's common-law fraud claim failed as a matter of law.*

¶72.    On appeal, Watson makes arguments as to why the proof at trial failed to establish several of the elements of the State's claim for common-law fraud. However, the most compelling argument centers around the sixth element, the hearer's ignorance of the false nature of the statement.

¶73.    In his final opinion, the chancellor who presided over the trial and heard the evidence wrote,

> After carefully reviewing all of the evidence submitted by the parties on the issue of the meaning of [Average Wholesale Price] and more importantly, Watson's and [the Department of Medicaid's] understanding of the meaning of [Average Wholesale Price], the evidence establishes that both Watson and [the Department] understood that Watson's [Average Wholesale Prices] . . . that were relied upon by [the Department] in determining its estimated acquisition cost reimbursement for Watson's drugs were not true average of wholesale prices charged by Watson to retailers for its particular drug products.

The above-quoted finding by the chancellor ended the State's fraud claim – full stop. After identifying the State's alleged representation and discussing the proof that led him to find that the representation was false, the trial judge unequivocally found that the Department of Medicaid knew it was false. As a matter of law, the finding should have been the end of the State's fraud claim, and a verdict in favor of Watson should have been entered because the State wholly failed to prove the sixth element.

D. *The trial judge erred when he invoked the equitable power of the court to reformulate the representation alleged by the State to satisfy the first element of its fraud claim.*

¶74. After acknowledging that the State knew full well that the Average Wholesale Prices supplied by Watson were not actually representative of the average prices paid by pharmacies for the drugs produced by Watson, the chancellor nevertheless embarked upon a exploration of the plain meaning of the words Average Wholesale Price and concluded that the State was entitled to believe they meant, well, average wholesale price. However, the chancellor's exploration of the meaning contradicts the conclusion he reached earlier when, in the above-quoted and clear language, he found that the State already knew Average Wholesale Price did not mean average wholesale price.

¶75. The chancellor went on to provide the following explanation:

> Finally, Chancery Courts are Courts of Equity. The "Chancellor[']s remedial powers are marked by plasticity. Equity jurisdiction permits innovation that justice may be done." ***Hall v. Wood***, 443 So. 2d 834, 842 (Miss. 1983). In the opinion of the Court, adopting the meaning of the Average Wholesale Price that Watson proposes would be inequitable, and the Court declines to do so.

In other words, after making factual findings fatal to the State's claim of fraud, which is a clearly defined legal claim with known elements, the chancellor untethered his ultimate finding of liability from the controlling law by claiming the authority in equity to disassociate his determination from the common-law elements of fraud. When the chancellor took the above-described step, he erred and wrongly based a multimillion-dollar damages award against the defendant on a claim never made and not cognizable in our law.

41

¶76. Equity follows the law; equity *must* follow the law. ***Joel v. Joel***, 43 So. 3d 424, 430 (¶ 20) (Miss. 2010). Courts of equity cannot ignore or change unambiguous legal principles to provide relief where the law forbids it. ***In re Estate of Miller***, 840 So. 2d 703, 708 (Miss. 2003). I find persuasive the reasoning of the unanimous Mississippi Court of Appeals in ***Mosley v. Triangle Townhouses, LLC***, 170 So. 3d 1251 (Miss. Ct. App. 2015). There, the plaintiff sued for specific performance and asked the chancery court to order the defendant to pay him "a fair and equitable finder's fee if he found a buyer" for the defendant's apartment complex. ***Mosley***, 170 So. 3d at 1252 (¶ 3). However, the plaintiff had no real estate broker's license and Mississippi's statutory law forbade him from recovering such a fee. ***Id.*** at 1252 (¶ 5). The plaintiff argued, "[E]quity follows the law as far as the law goes in securing the rights of the parties and no further. When the law stops short of securing this object, equity continues the remedy until complete justice is done." In other words, the plaintiff argued that, despite the bar to recovery presented by the statute, the court should be able to utilize its equitable powers to provide him with a remedy.

¶77. The Court of Appeals flatly rejected his argument, writing, "This is not a case where the law simply fails to go as far as justice requires. Instead, this is an area where the law actually places a roadblock preventing equity from going any further." ***Id.*** at 1254 (¶ 17). In the case *sub judice*, as in ***Mosley***, the law on fraud provides a roadblock, because the State cannot and did not prove every element of its claim. *See* ***Magniac v. Thomson***, 56 U.S. 281, 299 (1853) ("That wherever the rights or the situation of parties are clearly defined and

42

established by law, equity has no power to change or unsettle those rights or that situation, but in all such instances the maxim *equitas sequiter legem* is strictly applicable."). The chancellor erred when he cited equity to reach a result the law forbids.

> E. *No evidence supports an award against Watson for common-law fraud based on the chancellor's reformulation of the alleged representation.*

¶78. Even if equitable considerations allowed the chancellor to fashion relief denied by the failure of the State to prove the elements of common-law fraud, no evidence exists in the record to support an award of fraud under the chancellor's revised version of the allegedly false representation. The representation upon which the chancellor based his liability determination was that the Average Wholesale Price was "predictably related" to average market prices, as he put it in the section of his opinion discussing the Consumer Protection Act. On appeal, Watson contends that the State never provided any evidence that it had made any such statement. In its responsive brief, the State does not identify any testimony or other evidence otherwise. The very first element of a fraud claim is that a representation be made, and the claim must fail at the outset absent evidence of a representation.

## II. The chancellor erred by utilizing an outdated standard for finding Watson liable pursuant to the Mississippi Consumer Protection Act.

¶79. The chancery court determined that Watson had violated the Mississippi Consumer Protection Act. At issue is Mississippi Code Section 75-24-5(1), which prohibits "unfair methods of competition affecting commerce and unfair or deceptive trade practices in or affecting commerce." Section 75-24-5(2) provides that the following are "unfair methods

43

of competition and unfair or deceptive trade practices or acts" and are prohibited: "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he does not have;" and "Misrepresentations of fact concerning the reasons for, existence of, or amount of price reductions." Miss. Code Ann. §§ 75-24-5(2)(e),(k) (Rev. 2016). The chancery court provided six cases from other jurisdictions in which other courts "have determined that reporting inflated [average wholesale prices] in the manner Watson admittedly did in this case, constitutes a deceptive and unfair trade practice in violation of consumer protection laws substantial[ly] identical to Mississippi's [Consumer Protection Act].

¶80. The chancery court explained that Mississippi's Consumer Protection Act does not provide a definition of "unfair or deceptive trade practice[;]" therefore, it utilized guidance from the Federal Trade Commission and federal court precedent of analogous federal statutes. The chancery court's opinion relies on *FTC v. Raladam Co.*, 316 U.S. 149, 152 (1942), in which the United States Supreme Court determined that a particular act or practice is deceptive or unfair if it has the capacity or tendency to deceive. Rejecting Watson's argument that the case addressed regulations regarding advertisements of reductions off list prices and was inapplicable, the chancery court cited *In Re: Giant Food, Inc.*, 61 F.T.C. 326 (1962), to explain that "FTC regulations regarding advertisements for reductions off list prices maintain that a particular list price 'will not be deemed fictitious if it is the price at

which substantial (that is not isolated or insignificant) sales are made' but that one 'significantly in excess of the highest price at which substantial sales in the trade area are made' is misleading." Finally, the chancery court cited a Massachusetts district court case wherein a similar argument to Watson's sticker or list price argument was made. In *In Re: Lupron*, 295 F. Supp. 2d 148, 168 (n.19) (D. Mass. 2003), the district court stated: "There is a difference between a sticker price and a sucker price. If one were confronting a modest mark up of the actual [average wholesale price] . . . intended to make sales of the drug for the treatment of Medicare patients commercially viable . . . , it is unlikely that there would have been a government investigation of Defendants' marketing practices." Based on the above cases, the chancery court concluded that "Watson's conduct in causing to be published [average wholesale prices] that have no predictable relationship to what customers pay for its drugs while knowing Mississippi relied on this information in determining [estimated acquisition cost] is an unfair and deceptive trade or practice within the meaning of Mississippi's Consumer Protection Act."

¶81.    Watson argues that the chancery court erred in applying the "capacity or tendency to deceive" test, as it is outdated and has been replaced by the target audience test adopted by the Federal Trade Commission. According to the Federal Trade Commission's Policy Statement on Deception, 103 F.T.C. 110 (1983), a court first must determine whether there has been a representation, omission, or practice likely to mislead. Then, the practice must be examined from the perspective of a consumer acting reasonably in the circumstances.

45

Finally, the representation, omission, or practice must be material. Watson further explains that courts have rejected unreasonable interpretations by members of a target audience.

¶82. According to Watson, "Mississippi Medicaid utilized published '[average wholesale prices]' with complete understanding of its industry-wide meaning, again as evidenced by its own definition and its consistent practice of discounting off published [average wholesale prices]." Watson argues that its conduct was not material because no evidence was presented that Medicaid would have acted differently had it been aware of a falsity, a premise which is supported by the fact that Watson had not changed its methodology even after filing suit or appearing for oral arguments held in the course of the instant appeal.

¶83. Watson's conduct was not a violation of Mississippi's Consumer Protection Act. Mississippi Code Section 75-24-3(c) provides, "It is the intent of the Legislature that in construing what constitutes unfair or deceptive trade practices that the courts will be guided by the interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C.S. 45(a)(1)) as from time to time amended." Therefore, the above, newer Federal Trade Commission test is required and not the test relied upon by the chancery court. Courts have no discretion, but must follow constitutional statutory directives. *Stockstill v. State*, 854 So. 2d 1017, 1023 (¶ 13) (Miss. 2003) (citing *Anderson v. Lambert*, 494 So. 2d 370, 372 (Miss. 1986) (citing *Baker v. State*, 327 So. 2d 288 (Miss. 1976); *Carter v. Harrison Cty. Election Comm'n*, 183 So. 2d 630 (Miss. 1966); *Beard v. Stanley*, 205 Miss. 723, 39 So. 2d 317 (1949))). As the

***Stockstill*** Court wrote, "Our primary objective when construing statutes is to adopt that interpretation which will meet the true meaning of the Legislature." ***Stockstill***, 854 So. 2d at 1023 (¶ 13) (citations omitted). When it comes to the question of how courts should define unfair trade practices, the Legislature has made its intent crystal clear in Section 75-24-3; Courts must use the Federal Trade Commission interpretations.

¶84. In ***In re Cliffdale***, 103 F.T.C. 110 (1984), the Trade Commission explained:

> Consistent with its Policy Statement on Deception, issued on October 14, 1983, the Commission will find an act or practice deceptive if, first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material. *These elements articulate the factors actually used in most ea[r]lier Commission cases identifying whether or not an act or practice was deceptive, even though the language used in those cases was often couched in such terms as "a tendency and capacity to deceive."*

(Emphasis added.) Thus, the chancellor applied an inappropriate legal standard, as the above test clearly is the preferred test and is in line with the statutory directive. Because the chancellor applied the wrong legal standard, I would reverse and remand for the application of the correct one.

## III.   Conclusion

¶85. The trial court's finding acknowledging that the State knew of the falsity of the allegedly fraudulent statements defeats the State's common-law fraud claim as a matter of law. Both the compensatory and punitive damages awarded to the State based on the common-law fraud claim should be reversed. In contravention of the applicable statute, the

trial court employed the wrong legal standard to the State's claim that Watson violated the Mississippi Consumer Protection Act. I would reverse and render judgment in favor of Watson as to the State's common-law fraud claim and reverse and remand the Consumer Protection Act claim for the trial court to apply the correct legal standard.

**ISHEE, J., JOINS THIS OPINION.**